WEYMERS v KHERA

Docket No. 102961. Argued January 14, 1997 (Calendar No. 6). Decided
    June 17, 1997.

Kimberly and Jonathan Weymers brought a medical malpractice
    action in the Oakland Circuit Court against Drs. Rheka Khera, Gre-
    gorio V. Ferrer, and others, alleging negligence in the failure to
    timely diagnose and treat Kimberly, resulting in kidney failure. The
    court, Fred M. Mester, J., granted summary disposition for the
    defendants, noting that the plaintiff had failed to show that it was
    more probable than not that her kidney failure was caused by the
    alleged negligence, and refused to extend the lost opportunity doc-
    trine to a situation where the injury did not result in death. The
    court further held that a claim for pulmonary injury was not suffi-
    ciently pleaded, and denied the plaintiff's request to amend her
    complaint to allege pain and suffering from the pulmonary condi-
    tion. The Court of Appeals, WHITE, P.J., and GRIBBS and SMOLENSKI,
    JJ., reversed, holding that the lost opportunity doctrine applied to
    physical injury less than death, and that the trial court abused its
    discretion in not allowing the plaintiff to amend her complaint
    because the defendants were on notice of the claim of pulmonary
    injury and would not have been unduly prejudiced (Docket No.
    169280). Dr. Khera appeals.

    In an opinion by Justice RILEY, joined by Chief Justice MALLETT,
    and Justices BRICKLEY and WEAVER, the Supreme Court held:

    Under Michigan medical malpractice law, no cause of action
    exists for the loss of an opportunity to avoid physical harm less
    than death. The trial court did not abuse its discretion in determin-
    ing that the plaintiff did not sufficiently plead a claim for pain and
    suffering from her pulmonary injury and in denying the plaintiff's
    motion to amend her complaint to add a new claim for pulmonary
    injury.

    1. In a medical malpractice action, as part of its prima facie
    case, the plaintiff must prove that the defendant's negligence proxi-
    mately caused the plaintiff's injuries by proving both cause in fact
    and legal cause. The antithesis of proximate cause is the doctrine
    of lost opportunity, which allows recovery when the defendant's
    negligence possibly, i.e., a probability of fifty percent or less,

caused the plaintiff's injury. There are three alternative approaches to the lost opportunity doctrine: the pure lost chance approach, the proportional approach, and the substantial possibility approach. Each lowers the standard of causation, allowing recovery without establishing cause in fact. In this case, the Court of Appeals, relying on the substantial possibility approach, extended the lost opportunity doctrine to the loss of a substantial opportunity to avoid any physical harm, justifying its decision on deterrent reasons. While the deterrent and loss-allocation functions of tort law are important, scrapping causation must be rejected in negligence cases where the injury alleged is something less than death.

2. In medical malpractice actions, a plaintiff must allege, with reasonable definiteness and certainty, every fact necessary to constitute a cause of action by establishing the applicable standard of care, breach of that standard, injury, and proximate causation between the breach and the injury. In this case, the plaintiff's complaint was not sufficiently specific to inform the defendants of a claim of pulmonary injury; rather, it addressed only the injury of her kidneys. A plaintiff cannot make a general allegation of pain and suffering and expect the defendant to determine without any guidance from the plaintiff which injury formed the basis of the pain and suffering. Thus, the trial court did not abuse its discretion in ruling that a hint of pulmonary injury was insufficient to put the defendants on notice.

3. A motion to amend pleadings ordinarily should be granted, and should be denied only because of undue delay, bad faith, repeated failure to cure deficiencies, undue prejudice to the opposing party, and futility. A trial court may find prejudice when the moving party seeks to add a new claim or a new theory of recovery on the basis of the same set of facts, after discovery is closed, just before trial, and the opposing party shows that there was not reasonable notice, from any source, that the moving party would rely on the new claim or theory at trial. In this case, the trial court did not abuse its discretion in denying the plaintiff's motion to amend because the amendment sought to introduce a new claim just before trial, after discovery had closed, and the defendants demonstrated that they did not have knowledge that the plaintiff was intending to rely on the new claim at trial.

Justice BOYLE concurred only in the result.

Reversed.

Justice KELLY, concurring in part and dissenting in part, would recognize a cause of action for the loss of an opportunity to avoid physical harm less than death. The lost opportunity doctrine provides an exception to the general requirement of proving causation

in medical malpractice actions. A plaintiff must show only that there is a substantial possibility that the defendant's negligence cause the injury.

The policy reasons behind the lost opportunity doctrine apply equally to fatal and nonfatal cases. In each, the patient seeks to improve the opportunity of avoiding, ameliorating, or reducing physical harm and pain and suffering. The majority fails to explain why the doctrine is proper if death occurs, but not if a lesser injury is involved. Considering the policy arguments underlying the lost opportunity doctrine, there is no rational basis for distinguishing between cases in which death has resulted and cases in which physician negligence has limited recovery. *Falcon v Memorial Hosp*, 436 Mich 443 (1990), should be extended to nonfatal cases.

Justice CAVANAGH, dissenting, agreed that a cause of action for the loss of an opportunity to avoid physical harm less than death should be recognized. The trial court abused its discretion in denying the plaintiff's motion to amend the complaint to add an allegation of physical and mental pain and suffering from the aggravation of the pulmonary pathology.

210 Mich App 231; 533 NW2d 334 (1995) reversed.

1. NEGLIGENCE — MEDICAL MALPRACTICE — LOST OPPORTUNITY DOCTRINE.

Under Michigan medical malpractice law, no cause of action exists for the loss of an opportunity to avoid physical harm less than death.

2. PLEADING — MEDICAL MALPRACTICE — GENERAL ALLEGATIONS — PAIN AND SUFFERING.

A medical malpractice plaintiff cannot make a general allegation of pain and suffering and expect the defendant to determine, without any guidance from the plaintiff, which injury formed the basis of the pain and suffering.

3. PLEADING — NEW CLAIMS FOLLOWING DISCOVERY — LACK OF NOTICE.

A trial court may find prejudice when the moving party seeks to add a new claim or a new theory of recovery on the basis of the same set of facts, after discovery is closed, just before trial, and the opposing party shows that no reasonable notice was provided, from any source, that the moving party would rely on the new claim or theory at trial.

*Sommers, Schwartz, Silver & Schwartz, P.C.* (by *Robert B. Sickels* and *Patrick Burkett*), for the plaintiffs.

*David L. Rosenthal* for the defendant.

RILEY, J. In this appeal, we address three issues: (1) whether Michigan recognizes a cause of action for the loss of an opportunity to avoid physical harm less than death, (2) whether the trial court abused its discretion in determining that plaintiff's complaint did not sufficiently plead a claim for pain and suffering from her pulmonary injury,[1] and (3) whether the trial court abused its discretion in denying plaintiff's motion to amend her complaint to add a claim for pain and suffering from pulmonary injury. We hold that Michigan does not recognize a cause of action for the loss of an opportunity to avoid physical harm less than death. We also hold that the trial court did not abuse its discretion in ruling that plaintiff's complaint was inadequately specific and in refusing to allow plaintiff to amend her complaint. Accordingly, we reverse the Court of Appeals decision.

### FACTS AND PROCEEDINGS

In early October 1990, plaintiff Kimberly Weymers, who was twenty years old, became ill with coughing, fever, nausea, aching, and chest congestion. After her condition did not improve for more than a week, she went to defendant Walled Lake Medical Center where she was initially examined by a physician's assistant. The physician's assistant concluded from plaintiff's symptoms that she suffered from a respiratory infection and gave her antibiotics. After another week, plaintiff returned to the medical center because her symptoms intensified. The physician's assistant diag-

---

[1] For purposes of this appeal, we assume plaintiff suffered pulmonary injury.

nosed plaintiff with pneumonia and sent her home with a stronger prescription of antibiotics. On October 23, 1990, plaintiff visited the medical center a third time because her condition had not improved. A blood sample indicated that plaintiff suffered from severe anemia. Defendant Dr. Frank Fenton, the owner of the medical center, arranged for plaintiff to be admitted to defendant St. Joseph's Hospital in Pontiac.

On the evening of October 23, 1990, plaintiff was admitted to St. Joseph's intensive care unit and was given blood transfusions to combat the anemia. On October 24, 1990, defendant Dr. Rheka Khera examined plaintiff and suspected the possibility of a kidney problem and asked defendant Dr. Gregorio Ferrer, a nephrologist,[2] to examine her. Dr. Ferrer examined her that day and concluded that she could have a rare disease, Goodpasture's syndrome.[3] He began an immunosuppressive therapy[4] immediately, and scheduled a kidney biopsy for October 25, 1990. Plaintiff initially responded to the treatment, but soon

---

[2] Nephrology is "the branch of medical science that deals with the kidney." *Random House Webster's College Dictionary.*

[3] Goodpasture's syndrome is

> [t]he condition of having glomerulonephritis (a type of kidney disease, but more under glomerulonephritis) associated with hemoptysis (the spitting up of blood). It is generally a fatal disease, and at autopsy the lungs are found to show hemosiderosis (abnormal deposits of iron) or hemorrhage. [2 *Schmidt's Attorney's Dictionary of Medicine,* p G-120.]

[4] Immunosuppressive therapy is

> [t]he treatment of certain diseases (as multiple mycloma, chronic nephritis, autoimmune diseases, allergy) by medicines which suppress the immunity response of the body. [*Id.,* n 3 *supra,* p I-41.]

after her condition began to deteriorate. Plaintiff's biopsy was postponed until October 26, 1990, and she was placed on a respirator.

On October 26, 1990, plaintiff was transferred to William Beaumont Hospital in Royal Oak and placed under the care of Dr. Isam Salah. At the time, plaintiff had only ten to fifteen percent of her kidney functions. The biopsy was delayed for another three days. The hospital performed a plasma exchange, but it failed to save plaintiff's kidney functioning.[5] Plaintiff was placed on dialysis after her kidneys totally failed and eventually underwent a kidney transplant.

On August 16, 1991, plaintiff filed this medical malpractice suit against defendants Drs. Khera, Ferrer, and Fenton, and against Walled Lake Medical Center and St. Joseph Mercy Hospital. During discovery, plaintiff presented an affidavit by expert witness Dr. Eric Neilson, Chief of the Renal Division of the University of Pennsylvania Hospital, who testified that if defendants had given plaintiff proper care she would have had a thirty to forty percent chance of retaining the functioning of her kidneys. Dr. Neilson noted that plaintiff's life expectancy had been "significantly shortened" as a consequence of the loss of her kidneys, and that she would ultimately suffer a premature death.[6] After discovery was closed, St. Joseph's Hospital moved for summary disposition pursuant to MCR 2.116(C)(10), arguing that plaintiff had failed to demonstrate that the alleged negligence caused the

[5] At the time, St. Joseph's Hospital was not equipped to provide a plasma exchange.

[6] The statements from Dr. Neilson's September 21, 1993, affidavit were only presented to the court in a motion for reconsideration after the trial court had granted summary disposition in favor of defendants.

loss of her kidneys.[7] The other defendants joined the motion. In response to defendants' motion, plaintiff asserted that she could recover for her kidney damage even though there was less than a fifty percent chance that defendants' negligence caused the damage on the basis of the lost opportunity doctrine recognized in *Falcon v Memorial Hosp*, 436 Mich 443; 462 NW2d 44 (1990). Plaintiff also argued that her damages were not limited to the loss of her kidneys, but also included pain and suffering from her pulmonary injury.[8] Defendants responded that plaintiff had failed to allege damages from her pulmonary injury.

The trial court agreed with defendants and granted their motion for summary disposition. The trial court noted that plaintiff had failed to show that it was more probable than not that her kidney failure was caused by defendants' alleged negligence, and refused to extend the lost opportunity doctrine recognized in *Falcon*, a wrongful death case, to situations in which the injury did not result in death. The trial court further held that plaintiff's claim of pulmonary injury

---

[7] Before the hearing on the motion, defendants St. Joseph's Hospital, Walled Lake Medical Center, and Dr. Fenton settled their case with Weymers for approximately $300,000.

[8] Plaintiff attached an affidavit by Dr. Eric Neilson which stated, in relevant part:

> 3. Additionally, I am of the opinion that while a patient at St. Joseph Hospital, Kimberly Weymers suffered extensive pulmonary damage.

> 4. Specifically, I am of the opinion that the failure of the staff at St. Joseph Hospital to arrange for plasmapheresis therapy [plasma exchange], in a timely manner, resulted in the extensive pulmonary hemorrhage and deterioration.

> 5. Kimberly Weymers' pulmonary deterioration resulted in her placement on a ventilator for over two weeks, and she required extensive therapy thereafter.

was not sufficiently pleaded in her complaint. Plaintiff subsequently asked the trial court to allow her to amend her complaint to specifically allege pain and suffering from her pulmonary condition. The trial court denied this request.

Plaintiff appealed in the Court of Appeals, which reversed the decision of the trial court, holding that the lost opportunity doctrine applied to physical injury less than death. 210 Mich App 231, 236-237; 533 NW2d 334 (1995). The Court of Appeals also held that the trial court abused its discretion in not allowing plaintiff to amend her complaint because defendants were on notice of plaintiff's claim of pulmonary injury and therefore would not have been "unduly prejudiced" by the amendment.[9] *Id.* at 241.

Defendant Drs. Khera and Ferrer appealed, and this Court granted leave to appeal on May 22, 1996.[10]

## I. LOST OPPORTUNITY DOCTRINE

### A

Defendants brought their summary disposition motion pursuant to MCR 2.116(C)(10). Under that subsection, summary disposition is proper when "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." In other words, the "court must be satisfied . . . that 'it is impossible for the claim or

---

[9] The Court of Appeals did not address the issue whether plaintiff's complaint sufficiently pleaded a claim for pain and suffering from her pulmonary injury because it found that the trial court abused its discretion in denying plaintiff's motion to amend her complaint. See *id.* at 240, n 6.

[10] 451 Mich 898. On October 30, 1996, this Court dismissed Ferrer's appeal for failure to pursue.

defense to be supported at trial because of some deficiency which cannot be overcome.' " *Stevens v McLouth Steel Products Corp*, 433 Mich 365, 370; 446 NW2d 95 (1989), quoting *Rizzo v Kretschmer*, 389 Mich 363, 372; 207 NW2d 316 (1973). In making that determination, the court considers affidavits, pleadings, depositions, admissions, and documentary evidence filed by the parties in the light most favorable to the party opposing the motion. *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996). We review summary disposition decisions de novo. *Groncki v Detroit Edison Co*, 453 Mich 644, 649; 557 NW2d 289 (1996).

B

We address whether the Court of Appeals erred in recognizing a cause of action for the loss of an opportunity to avoid physical harm less than death.

Under Michigan medical malpractice law, as part of its prima facie case, a plaintiff must prove that the defendant's negligence proximately caused the plaintiff's injuries. MCL 600.2912a; MSA 27A.2912(1); *Locke v Pachtman*, 446 Mich 216, 222; 521 NW2d 786 (1994). To establish proximate cause, the plaintiff must prove the existence of both cause in fact and legal cause. *Skinner v Square D Co*, 445 Mich 153, 162-163; 516 NW2d 475 (1994). To establish cause in fact,

> the plaintiff must present substantial evidence from which a jury may conclude that more likely than not,[11] but for the

---

[11] The phrase "more likely than not" means a probability more than fifty percent. *Falcon, supra* at 450, n 6.

defendant's conduct, the plaintiff's injuries would not have occurred.

\*      \*      \*

"The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." [*Id.* at 164-165, quoting Prosser & Keeton, Torts (5th ed), § 41, p 269.][12]

To establish legal cause, the plaintiff must show that it was foreseeable that the defendant's conduct "may create a risk of harm to the victim, and . . . [that] the result of that conduct and intervening causes were foreseeable." *Moning v Alfono*, 400 Mich 425, 439; 254 NW2d 759 (1977).

The antithesis of proximate cause is the doctrine of lost opportunity. The lost opportunity doctrine allows a plaintiff to recover when the defendant's negligence possibly, i.e., a probability of fifty percent or less, caused the plaintiff's injury.[13] See Reisig, *The loss of a*

---

[12] See also *Jordon v Whiting Corp*, 396 Mich 145, 151; 240 NW2d 468 (1976) ("[t]he mere possibility that a defendant's negligence may have been the cause, either theoretical or conjectural, of an accident is not sufficient to establish a causal link between the two"); *Glinski v Szylling*, 358 Mich 182, 201-202; 99 NW2d 637 (1959) ("[a] case cannot go to a jury supported merely by sheer speculation that something might have been a cause, or, going one step further, that there was a possibility that something was the cause"); *Daigneau v Young*, 349 Mich 632, 636; 85 NW2d 88 (1957) (" '[t]here must be more than a mere possibility that unreasonable conduct of the defendant caused the injury' ").

[13] Stated another way, the lost opportunity doctrine permits a plaintiff to maintain an action for malpractice when the malpractice denied the plaintiff an opportunity to avoid the injury, even where the opportunity was fifty percent or less.

*chance theory in medical malpractice cases: An overview*, 13 Am J Trial Advocacy 1163 (1990). In *Falcon, supra* at 469-470 (LEVIN, J., lead opinion), 472-473 (BOYLE, J., concurring), this Court adopted the lost opportunity doctrine in wrongful death cases. Our Legislature immediately rejected *Falcon* and the lost opportunity doctrine. MCL 600.2912a(2); MSA 27A.2912(1)(2).[14] Accordingly, *Falcon* only applies to causes of action that arose before October 1, 1993. See 1993 PA 78, subsection 4(1) (providing the effective date of the amendment). We do not address the issue raised in *Falcon* because it is not now before this Court.[15] However, for the reasons that follow, we refuse to extend *Falcon*. Specifically, we hold that no cause of action exists for the loss of an opportunity to avoid physical harm less than death.[16]

---

[14] Subsection 2912a(2) provides:

In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants. In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%.

[15] Plaintiff's argument that her case falls within *Falcon* because defendants' negligence will likely lead to a premature death is unpersuasive because plaintiff's claim was for injury to her kidneys, it was not for wrongful death.

[16] Although the case before us is a medical malpractice action, we note that our holding applies to all negligence actions. However, our decision today does not affect the situation where the inextricable combination of joint tortfeasors combines to cause harm in a manner where individual responsibility cannot be fixed. Thus, where several factors combine to produce an injury, and where any one of them, operating alone, would have been sufficient to cause the harm, a plaintiff may establish factual causation by showing that the defendant's actions, more likely than not, were a "substantial factor" in producing a plaintiff's injuries. *Brisboy v Fibreboard Corp*, 429 Mich 540, 547; 418 NW2d 650 (1988). See also Prosser & Keeton, *supra*, § 41, p 266. These situations are distinguishable

C

There are three alternative approaches to the lost opportunity doctrine: (1) the pure lost chance approach, (2) the proportional approach, and (3) the substantial possibility approach. Each approach lowers the standard of causation, with the effect that a plaintiff is allowed to recover without establishing cause in fact.

The pure lost chance approach allows a plaintiff to recover for his injury even though it was more likely than not that he would have suffered the injury if the defendant had not been negligent. See *Thompson v Sun City Community Hosp*, 141 Ariz 597; 688 P2d 605 (1984). The plaintiff only has to show that the defendant's negligence decreased the plaintiff's chance, no matter how slight, of avoiding the injury. *Id.* If the plaintiff makes such a showing, he receives full damages.[17] *Id.*

The proportional approach is identical to the pure lost chance approach; however, the plaintiff's recovery is limited to the percent of chance lost multiplied by the total amount of damages that would ordinarily be recovered in that action. *McKellips v St Francis Hosp, Inc*, 741 P2d 467, 476 (Okla, 1987). For example,

---

from the lost opportunity doctrine because liability is fastened only after a judicial determination that the plaintiff's injuries were caused by someone, but proof of that responsibility is impossible. In lost opportunity cases, the preponderance of the evidence suggests that no known person was at fault.

[17] Only five states follow this extreme approach. See Moore, *South Carolina rejects the lost chance doctrine*, 48 SC L R 201, 207 (1996), citing *Thompson, supra; Gooding v Univ Hosp Bldg, Inc*, 445 So 2d 1015 (Fla, 1984); *Hastings v Baton Rouge Gen'l Hosp*, 498 So 2d 713 (La, 1986); *Hamil v Bashline*, 481 Pa 256; 392 A2d 1280 (1978); *Thornton v CAMC*, 172 W Va 360; 305 SE2d 316 (1983).

if a patient had forty percent chance of recovering from
breast cancer and a negligent physician's misdiagnosis
results in her chances dropping to ten percent, then the
plaintiff can recover thirty percent of her total death-related
injuries. Thus, if her damages totaled $100,000, the plaintiff
could recover $30,000. [Moore, *South Carolina rejects the
lost·chance doctrine*, 48 SC L R 201, 202 (1996).]

The last approach, the substantial possibility
approach, was adopted by this Court in *Falcon* for
wrongful death cases. It also is a variation of the pure
lost chance approach. Under this approach, the plain-
tiff must show that there is a substantial possibility
that the defendant's negligence caused his injury. See
*Falcon, supra* at 469. It is unclear what constitutes a
"substantial possibility." See *id.* at 470 (holding that a
37.5 percent chance of survival was substantial, but
refusing to state what constitutes a threshold showing
of substantial). It is clear, however, that it does not
have to be more than fifty percent.[18] *Id.* Thus, the
substantial possibility approach is identical to the
other approaches to the extent that each approach
allows a plaintiff to recover for his injury even though
it was more likely than not that he would have suf-
fered the injury if the defendant had not been
negligent.[19]

---

[18] Furthermore, this Court in *Falcon, supra* at 471, combined the sub-
stantial possibility approach with the proportional approach and reduced
the damage award to reflect the percentage of chance lost.

[19] In *Falcon, supra* at 469, this Court defined the injury as the loss of
opportunity to avoid the harm, i.e., the death, rather than the harm itself.
Redefining the injury, however, does not solve the causation problem:

Whether the court lowers the standard of causation or redefines
the injury as a lost chance, the result is the same in that a plaintiff
receives compensation despite the greater probability that he or
she would have suffered the injury even if the physician had used
due care. [Moore, *Lost chance doctrine*, n 17 *supra* at 206-207.]

D

Turning to the case now before this Court, the Court of Appeals, relying on the substantial possibility approach, extended the lost opportunity doctrine to the loss of a substantial opportunity to avoid any physical harm. The Court justified its decision on the often proffered reason of deterrence:

If the lost opportunity doctrine is limited to cases only involving death, potentially flagrant examples of malpractice could go uncompensated in cases in which the same negligent failure to diagnose or treat results in a lost opportunity to avoid egregious harm, i.e., paralysis or coma. Thus, the deterrent and loss-allocation functions of tort law would be undermined if defendants could escape liability for the effects of negligent conduct that cause demonstrable losses. [210 Mich App 237.]

We acknowledge that the deterrent and loss-allocation functions of tort law are important.[20] How-

_____

[20] Professor Joseph H. King, Jr., championed the deterrence argument for the lost opportunity doctrine in his article, *Causation, valuation, and chance in personal injury torts involving preexisting conditions and future consequences*, 90 Yale L J 1353, 1377 (1981):

The all-or-nothing approach to loss of a chance also subverts the deterrence objectives of tort law by denying recovery for the effects of conduct that causes statistically demonstrable losses. By placing such losses outside tort law, the all-or-nothing approach distorts the loss-assigning role of that law. Over the universe of such cases, losses of chances of avoiding both the adverse effects of a preexisting condition and the occurrence of future consequences of an injury represent actual losses. We can be statistically certain, for example, that a number of patients with probably (but not necessarily) fatal preexisting conditions would have achieved the hoped-for cure in the absence of the tortious conduct, even if none individually had a better-than-even chance of doing so. A failure to allocate the costs of these losses to their tortious sources undermines the whole range of functions served by the causation-valuation process and strikes at the integrity of the torts system of loss allocation.

ever, we reject scrapping causation (the bedrock of our tort law) in negligence cases where the injury alleged by the plaintiff is something less than death, for the lost opportunity doctrine's deterrent effect. As the Texas Supreme Court succinctly stated:

> [W]e reject the notion that the enhanced deterrence of the loss of chance approach might be so valuable as to justify scrapping our traditional concepts of causation. If deterrence were the sole value to be served by tort law, we could dispense with the notion of causation altogether and award damages on the basis of negligence alone. [*Kramer v Lewisville Memorial Hosp*, 858 SW2d 397, 406 (Tex, 1993).]

Furthermore, the South Carolina Supreme Court reflects our sentiments in this regard:

> We are persuaded that "the loss of chance doctrine is fundamentally at odds with the requisite degree of medical certitude necessary to establish a causal link between the injury of a patient and the tortious conduct of a physician." Legal responsibility in this approach is in reality assigned based on the mere *possibility* that a tortfeasor's negligence was a cause of the ultimate harm. This formula is contrary to the most basic standards of proof which undergird the tort system. [*Jones v Owings*, 318 SC 72, 77; 456 SE2d 371 (1995) (emphasis in original, citations omitted).]

Accordingly, because we refuse to discard causation in negligence actions of this kind, we do not recognize a cause of action for the loss of an opportunity to avoid physical harm less than death. Therefore, the Court of Appeals recognition of such a cause of action was in error and is reversed.

II. SPECIFICITY AND AMENDMENT OF PLEADING

A

Decisions concerning the meaning and scope of pleading, and decisions granting or denying motions to amend pleadings, are within the sound discretion of the trial court and reversal is only appropriate when the trial court abuses that discretion. *Dacon v Transue*, 441 Mich 315, 328; 490 NW2d 369 (1992); *Ben P Fyke & Sons v Gunter Co*, 390 Mich 649, 658; 213 NW2d 134 (1973).

B

We first address whether the trial court abused its discretion in holding that plaintiff's complaint did not sufficiently plead a claim for pain and suffering from her pulmonary injury.

MCR 2.111(B)(1) requires that a complaint be specific enough to reasonably inform the adverse party of the nature of the claims against him. This Court, in *Dacon*, *supra* at 329, explained that

> [t]his rule is designed to avoid two opposite, but equivalent, evils. At one extreme lies the straightjacket of ancient forms of action. Courts would summarily dismiss suits when plaintiffs could not fit the facts into these abstract conceptual packages. At the other extreme lies ambiguous and uninformative pleading. Leaving a defendant to guess upon what grounds plaintiff believes recovery is justified violates basic notions of fair play and substantial justice. Extreme formalism and extreme ambiguity interfere equivalently with the ability of the judicial system to resolve a dispute on the merits. The former leads to dismissal of potentially meritorious claims while the latter undermines a defendant's opportunity to present a defense. . . . Neither is acceptable.

In medical malpractice actions, a plaintiff must allege, with reasonable definiteness and certainty, every fact necessary to constitute a cause of action. *Dacon, supra* at 332-333; *Simonelli v Cassidy*, 336 Mich 635, 644; 59 NW2d 28 (1953). To establish medical malpractice, a plaintiff must establish the following elements: (1) the applicable standard of care, (2) breach of that standard, (3) injury, and (4) proximate causation between the alleged breach and the injury. *Locke, supra* at 222.

C

Turning to the case before this Court, plaintiff argues that the trial court abused its discretion in determining that her complaint did not sufficiently plead a claim for pain and suffering from her pulmonary injury. We disagree and hold that the trial court did not abuse its discretion.

Plaintiff's first amended complaint was not specific enough to reasonably inform defendants of a claim for pulmonary injury. Paragraph 29, the section of plaintiff's complaint addressing the proximate cause and injury elements of plaintiff's malpractice claim, did not mention pulmonary injury. Rather, it only addressed the injury of plaintiff's kidneys:

> As a direct and proximate result of the aforementioned acts of negligence and malpractice as described in paragraphs 26 and 28, Plaintiff, Kimberly Weymers, has suffered and continues to suffer severe and grievous injuries and damages, including, but not limited to, the following:
> A. Significant medical expenses, past, present and future.
> B. Loss of earnings and earning capacity.
> C. Severe physical and mental pain and suffering, anxiety, emotional anguish, embarrassment, humiliation and loss of natural enjoyments of life.

D. *Permanent loss of all renal*[21] *function requiring
periodic and frequent dialysis.*[22] [Emphasis added.]

We are not persuaded by plaintiff's argument that
the trial court abused its discretion by refusing to rec-
ognize that plaintiff's general allegation of pain and
suffering encompassed her claim for pulmonary
injury. A plaintiff in a malpractice action cannot make
a general allegation of pain and suffering and expect
the defendant to determine without any guidance

---

[21] Renal is defined as "of or pertaining to the kidneys or the surround-
ing regions." *Random House Dictionary*, n 2 *supra.*

[22] Furthermore, the first section of the complaint, which set forth the
general allegations with regard to all defendants, indicated that the
asserted injury was limited to plaintiff's kidneys:

19. Defendant, Dr. Rheka Khera's admitting differential diagnosis
included Goodpastures [sic] Syndrome.

20. On or about October 25, 1990, Defendant, Dr. Rheka Khera
requested a consultation from Defendant, Dr. Gregorio Ferrer, a
nephrologist, and the consultation was performed on that date.

21. Defendant, Dr. Gregorio Ferrer, also reached the impression
of Goodpastures Syndrome, ordered the administration of steroid
therapy and planned to perform a kidney biopsy the next day.

22. On October 26, 1990, before the kidney biopsy was per-
formed, Kimberly Weymers was transferred to Beaumont Hospital
in Royal Oak where she was admitted.

23. Plaintiff, Kimberly Weymers, remained hospitalized at Beau-
mont Hospital until November 20, 1990. During her confinement,
she was diagnosed as having and was treated for Goodpastures
Syndrome.

Similarly, the section of the complaint setting forth the applicable stan-
dards of care did not mention pulmonary medicine. The standards of care
were as follows:

(1) Walled Lake Medical Center had the duty to provide plaintiff with
the "standards of care applicable to physicians specializing in the field of
family practice" (¶¶ 25, 27);

(2) Khera had the duty to provide plaintiff with the "standards of prac-
tice applicable to physicians who have specialized in the field of internal
medicine" (¶ 31); and

(3) Ferrer had the duty to provide plaintiff with the "standards of prac-
tice applicable to physicians specializing in the field of internal medicine
and nephrology" (¶ 35).

from the plaintiff which injury formed the basis of the pain and suffering. See *Dacon, supra* at 330 (concluding that pleadings that "alleg[e] everything . . . allege[] nothing [and] . . . are not proper under MCR 2.111"). Moreover, unlike plaintiff's claim for pulmonary injury, defendants were on notice of plaintiff's claim for pain and suffering resulting from her kidney failure because plaintiff specifically alleged in paragraph 29 of her complaint that she suffered injury to her kidneys.

The only arguable mention of pulmonary injury in plaintiff's complaint was in the sections addressing defendants Dr. Khera's and Walled Lake Medical Center's alleged breach of the standard of care:

> Failure [of Dr. Khera] to obtain appropriate consultations in a timely manner, including a nephrology consult and a pulmonary consult. [¶ 32.][23]

> Failure [of Walled Lake Medical Center] to refer Kimberly Weymers for appropriate consultation in light of her presenting [sic] history, signs and symptoms, including a consultation with an internist, pulmonologist or nephrologist. [¶ 28.][24]

We conclude that the trial court did not abuse its discretion in ruling that this hint of pulmonary injury

---

[23] The significance of this allegation was diluted, however, because the next paragraph stated that plaintiff suffered the injuries mentioned in paragraph 29 of the complaint (which discusses kidney damage) as a proximate cause of the breach. See ¶ 33.

[24] We note that the paragraph discussing defendant Dr. Ferrer's alleged breach of duty suggests that the injury suffered was kidney failure:

> Failure to promptly and timely perform a kidney biopsy, resulting in a delay in the proper management of Plaintiff's condition. [¶ 36.]

was insufficient to put defendants on notice.[25] Thus, the trial court's determination that plaintiff's claim for pulmonary injury was not sufficiently pleaded was not an abuse of discretion.

D

We next address whether the trial court abused its discretion in refusing to allow plaintiff to amend her complaint to include a claim for pain and suffering from her pulmonary injury.

If a court grants summary disposition pursuant to MCR 2.116(C)(8), (9), or (10), the court must give the parties an opportunity to amend their pleadings pursuant to MCR 2.118, unless the amendment would be futile. MCR 2.116(I)(5). MCR 2.118(A)(2) provides that leave to amend a pleading "shall be freely given when justice so requires." Under subrule A(3), the court can order the amending party to compensate the opposing party for the additional expense caused by the late amendment, including reasonable attorney fees.

A motion to amend ordinarily should be granted, and should be denied only for the following particularized reasons:

"[1] undue delay, [2] bad faith or dilatory motive on the part of the movant, [3] repeated failure to cure deficiencies by amendments previously allowed, [4] undue prejudice to the opposing party by virtue of allowance of the amendment, [and 5] futility . . . ." [*Fyke, supra* at 656.]

---

[25] For similar reasons, plaintiff's argument that her claim for pulmonary injury was sufficiently alleged because the nature of Goodpasture's syndrome is that it results in pulmonary hemorrhage and kidney damage is unpersuasive. It should not need repeating that a complaint alleging malpractice must state with reasonable specificity and certainty the facts necessary to establish the cause of action. See *Dacon, supra* at 332-333.

If a trial court denies a motion to amend, it should specifically state on the record the reasons for its decision. *Id.* at 656-657.

Delay, alone, does not warrant denial of a motion to amend. *Fyke, supra* at 663-664. However, a court may deny a motion to amend if the delay was in bad faith or if the opposing party suffered actual prejudice as a result. *Id.* "Prejudice" in this context does not mean that the allowance of the proffered amendment may cause the opposing party to ultimately lose on the merits. *Id.* at 657. Rather, "prejudice" exists if the amendment would prevent the opposing party from receiving a fair trial, if for example, the opposing party would not be able to properly contest the matter raised in the amendment because important witnesses have died or necessary evidence has been destroyed or lost. *Id.* at 663.

In *Fyke*, we suggested that there may be some cases in which the delay is so long and the amendment so substantial that the opposing party would be denied a fair trial by the delay, and therefore be prejudiced:

> The litigation may proceed to a point where the opposing party cannot reasonably be expected to defend against the amendment; this is an especially pertinent factor on the eve of, during, or after trial. [*Id.*]

We reaffirm this principle, but clarify its application. We hold that a trial court may find prejudice when the moving party seeks to add a new claim or a new theory of recovery on the basis of the same set of facts, after discovery is closed, just before trial, and the opposing party shows that he did not have reasonable notice, from any source, that the moving

party would rely on the new claim or theory at trial.[26]
We recognize that parties ought to be afforded great
latitude in amending their pleading before trial, how-
ever, that interest must be weighed against the par-
ties' and the public's interest in the speedy resolution
of disputes. As Judge John L. Coffey of the United
States Court of Appeals for the Seventh Circuit
explained:

While Fed R Civ P 15[27] favors amendments when
required by justice, it is not a license for carelessness or
gamesmanship. Parties to litigation have an interest in
speedy resolution of their disputes without undue expense.
Substantive amendments to the complaint just before trial
are not to be countenanced and only serve to defeat these

---

[26] We note the distinction between the strict requirements for amend-
ment at trial of MCR 2.118(C)(2) and the free amendment rule of MCR
2.118(A)(2). However, MCR 2.118(A)(2) is not limitless. Under MCR
2.118(A)(2), the proposed amendment should be granted unless the party
opposing the amendment shows that one of the five particularized rea-
sons specified in *Fyke, supra* at 656, which includes prejudice, exists.

[27] MCR 2.118 is based on GCR 1963, 118. GCR 1963, 118 "is an adop-
tion of Federal Rule 15." *LaBar v Cooper*, 376 Mich 401, 405; 137 NW2d
136 (1965). Further, this Court has been guided by federal precedent in
this area. See *Fyke, supra* at 656. Rule 15(a) of the Federal Rules of Civil
Procedure provides, in relevant part:

[A] party may amend the party's pleading only by leave of court
or by written consent of the adverse party; and leave shall be freely
given when justice so requires.

Furthermore, federal courts are permitted to deny a motion to amend a
pleading only if one of the five particularized reasons stated in *Fyke,
supra* at 656, exists. See *Foman v Davis*, 371 US 178, 182; 83 S Ct 227; 9 L
Ed 2d 222 (1962):

In the absence of any apparent or declared reason—such as
undue delay, bad faith or dilatory motive on the part of the movant,
repeated failure to cure deficiencies by amendments previously
allowed, under prejudice to the opposing party by virtue of allow-
ance of the amendment, futility of amendment, etc.—the leave
sought should, as the rules require, be "freely given."

interests. The district court must consider the harm when deciding whether to grant leave.

Defense of a new claim obviously will require additional rounds of discovery, in all probability interview of new witnesses, gathering of further evidence, and the identification of appropriate legal arguments. All this necessarily takes time. The parties must have an opportunity for preparation if trial is to be meaningful and clear. Some delay of trial therefore is inevitable—a natural consequence of allowing claims to be brought at all. In this sense, delay alone is not a sufficient basis for refusing an amendment. On the other hand, amendments near the time set for trial may require postponement when the same allegations made earlier would have afforded ample time to prepare without delay. Plaintiff is not entitled to impede justice by imposing even reasonable preparation intervals *seriatim*. Cf. *Ins v Abudu*, [485 US 94, 95] 108 S Ct 904, 913; 99 L Ed 2d 90 (1988) ("strong public interest in bringing litigation to a close as promptly as is consistent with the interest in giving the adversaries a fair opportunity to develop and present their respective cases"). Whether it results from bad faith or mere absentmindedness, a district judge may act to deter such artificial protraction of litigation, and its costs to all concerned, by denying the amendment. *Zenith Radio Corp* [*v Hazeltine Research, Inc*], 401 US [321], 330 [91 S Ct 795; 28 L Ed 2d 77 (1971)]; *Bohen* [*v City of East Chicago, Ind*], 799 F2d [1180], 1184-1185 [(CA 7, 1986)]. [*Feldman v Allegheny Int'l, Inc*, 850 F2d 1217, 1225-1226 (CA 7, 1988).]

The United States Court of Appeals for the Sixth Circuit further explained in *Priddy v Edelman*, 883 F2d 438, 446-447 (CA 6, 1989):

A party is not entitled to wait until the discovery cutoff date has passed and a motion for summary judgment has been filed on the basis of claims asserted in the original complaint before introducing entirely different legal theories in an amended complaint. . . . In complex cases such as this one, . . . it is particularly likely that drastic amendments on the eve of trial will prejudice the defendants. . . .

Putting the defendants "through the time and expense of continued litigation on a new theory, with the possibility of additional discovery, would be manifestly unfair and unduly prejudicial." [Citations omitted.][28]

E

Turning to the case now before this Court, plaintiff attempted to amend paragraph 29 of her complaint to add the following subparagraph:

Physical and mental pain and suffering resulting from the aggravation of the pulmonary pathology.

Defendants opposed the motion, asserting that they would be prejudiced by the amendment because plaintiff was introducing her claim for pulmonary injury for the first time just before trial was scheduled to begin. The trial court denied plaintiff's motion, focusing on the length of the delay and on defendants' lack of notice of plaintiff's new claim:

The Court is satisfied that this is a 1991 case. The Defendants did not have notice that the general damage element of pain and suffering was specific to the damages arising out of pulmonary pathology. Defendants prepared for trial and the Defendants prepared for mediation, the Court is satisfied, due to the loss of renal function. And despite the Plaintiff's contentions, the Court's [sic] satisfied that the Motion for Amendment of the Complaint, Second Amended Complaint, should be denied, and I do so.

The Court of Appeals reversed the decision of the trial court, holding that it abused its discretion in

---

[28] See also *Acri v Int'l Ass'n of Machinists & Aerospace Workers*, 781 F2d 1393, 1398 (CA 9, 1986); *Stein v United Artists Corp*, 691 F2d 885, 898 (CA 9, 1982); *Addington v Farmer's Elevator Mut Ins Co*, 650 F2d 663, 666-667 (CA 5, 1981).

denying plaintiff's motion to amend because the evidence established that defendants "had notice of potential pulmonary complications and thus would not have been unduly prejudiced . . . ." 210 Mich App 241. In doing so, the Court of Appeals rejected defendants' argument that plaintiff's amendment sought to add a new theory to the case. *Id.* at 242.

Contrary to the Court of Appeals assertion, we hold that plaintiff's amendment did seek to introduce a new theory or claim into the case and that defendants did not have reasonable notice that plaintiff would rely on that new theory at trial.

Plaintiff argues that her amendment sought to change the type of damages sought, not add a different claim or theory to the case, and that, therefore, on the basis of *Sherrard v Stevens*, 176 Mich App 650, 654; 440 NW2d 2 (1988), she was entitled to the amendment. In *Sherrard, supra* at 655, the Court of Appeals held:

> While we note that the amendment came shortly before trial, we also note that the amendment did not raise new factual allegations, but merely claimed new types of damages arising from the same set of factual allegations. Accordingly, we do not believe that the trial court abused its discretion in granting the motion to amend the complaint.

Plaintiff's argument is unpersuasive because her case is distinguishable from *Sherrard*. In *Sherrard*, the plaintiffs sought to amend their legal malpractice complaint to add a prayer for exemplary damages. Plaintiff Weymers, on the other hand, sought to amend her complaint to change the type of injury she claimed was proximately caused by defendants' negli-

gence.[29] Therefore, plaintiff's amendment is more appropriately characterized as raising a new claim or theory, not a new type of damages.

Plaintiff's argument that defendants had reasonable notice of her pulmonary claim is also unpersuasive. Although deposition testimony,[30] medical records,[31]

---

[29] Thus, plaintiff's amendment requested the court to change two of the four elements of her malpractice action—proximate cause and injury. Plaintiff would have to reestablish the proximate cause element by changing the injury element because the elements are interdependent. In other words, if a plaintiff is required to prove a new injury, she must, by definition, reestablish proximate cause.

[30] Defendants' questioning of plaintiff's expert witness, Dr. Eric Neilson, is illustrative of their knowledge that Goodpasture's syndrome attacks the lungs and that plaintiff suffered lung damage:

Q. Doctor, I'd like to talk a little bit about what Goodpasture's syndrome is. It's my understanding it's an autoimmune disorder characterized by antiglomerular antibodies which attack the basement membranes of the lung and kidney; would that be correct?

A. Yes.

Q. . . . The diagnosis of Goodpasture's is differentiated between other diseases which attack—attack the renal system in that it manifests itself both in the lungs and in the kidneys; correct?

A. Yes, there are groups of diseases that affect both the lung and the kidneys; simply that's one of them.

*     *     *

Q. Doctor, is there evidence that her [plaintiff's] lung hemorrhage got worse because she became ventilator dependent; is that the evidence?

A. No, I think her lung hemorrhage became more profound because she was in the middle of a very active disease and it wasn't treated.

Q. Okay. I am not asking if the ventilator caused or contributed to the lung hemorrhage, I want to know what evidence there is in the chart that the lung hemorrhage got worse from the time . . .

A. Her chest x-rays looked worse and the fact she was not able to ventilate herself suggested she had great difficulty in doing it on her own.

[31] For instance, defendant Dr. Khera acknowledged in plaintiff's pulmonary discharge summary that "[t]he patient ended up being on a *respirator* . . . ." Also, plaintiff's medical records from William Beaumont Hospi-

and the mediation summary[32] suggested that defendants had knowledge that Goodpasture's syndrome causes pulmonary injury and that plaintiff suffered such injury, defendants had no notice that plaintiff was intending to assert a claim for pulmonary injury at trial.[33] This distinction is significant. If defendants had no notice that plaintiff was intending to assert an independent claim for pulmonary injury, the brief mention of pulmonary injury during the discovery process cannot reasonably be said to automatically make its later appearance as a claim nonprejudicial against defendants. Given the wide latitude of the discovery rules, see MCR 2.302(B), as far as defendants were concerned, the sporadic mention of pulmonary injury during discovery could have been simply fortuitous.

Plaintiff also relies on *Terhaar v Hoekwater*, 182 Mich App 747, 752; 452 NW2d 905 (1990), in support of her contention that defendants had reasonable notice of her claim for pulmonary injury. Plaintiff's reliance on *Terhaar* is misguided because in *Terhaar*, unlike the case now before us, the plaintiff not only investigated and pursued her new theory during dis-

---

tal state that plaintiff was on a respirator for two weeks: "For the respiratory failure, patient was being ventilated from Oct. 26, 1990 in Beaumont Hospital to Nov. 10, 1990."

[32] Plaintiff's mediation summary states that Goodpasture's syndrome is believed to be a combination of diseases which attacks the lungs and kidneys.

[33] In fact, in response to defendants' interrogatory requesting plaintiff to "state specifically and in detail how the alleged negligence is causally related to the injury," plaintiff replied:

Early diagnosis of Good Pasture [sic] Syndrome would have resulted in earlier initiation of therapy and would have prevented complete destruction of kidney function.

covery, she also notified the defendant during discovery that she would pursue that theory at trial.[34]

Therefore, we conclude that the trial court did not abuse its discretion in denying plaintiff's motion to amend because the amendment sought to introduce a new claim just before trial, after discovery had closed, and defendants demonstrated that they did not have knowledge that plaintiff was intending to rely on the new claim at trial.

## CONCLUSION

We conclude that Michigan does not recognize a cause of action for the loss of an opportunity to avoid

---

[34] The plaintiff in *Terhaar* initially brought a medical malpractice action, alleging that the defendant was "negligent during a wisdom tooth extraction which allegedly resulted in paresthesia, or numbness, to her jaw." *Id.* at 749. However, during discovery, both parties investigated whether the defendant had properly advised the plaintiff before the extraction of possible complications. *Id.* The plaintiff also indicated in her mediation summary that "she would pursue a theory of lack of informed consent." *Id.* Furthermore, the plaintiff's initial complaint even suggested that she would be pursuing that theory:

"On November 6, 1984, Defendant breached his duty to Plaintiff and was guilty of one or more of the following careless, negligent, and improper acts and/or omissions:

\*     \*     \*

"(f) Failure to examine, evaluate, treat and advise Plaintiff as any reasonably careful and prudent dentist in the same situation." [*Terhaar, supra* at 749.]

In fact, the Court of Appeals held that "[d]efendant would not have been prejudiced by the amendment because he had notice of the generalized allegation of inadequate advice in paragraph seven, subsection (f) of plaintiff's original complaint." *Id.* at 752.

The plaintiff sought to amend her complaint to add the theory of lack of informed consent just before trial. The trial court denied the plaintiff's motion, and the Court of Appeals reversed, holding that the defendant had reasonable notice of the plaintiff's lack of informed consent claim. *Id.* at 752.

physical harm less than death. Thus, the trial court
properly granted defendants' summary disposition
motion. We further conclude that the trial court did
not abuse its discretion in determining that plaintiff
did not sufficiently plead a claim for pain and suffer-
ing from her pulmonary injury. The trial court also did
not abuse its discretion in denying plaintiff's motion
to amend her complaint to add a new claim for pul-
monary injury. Accordingly, we reverse the Court of
Appeals decision.

MALLETT, C.J., and BRICKLEY and WEAVER, JJ., con-
curred with RILEY, J.

BOYLE, J., concurred only in the result.

KELLY, J. (*concurring in part and dissenting in
part*). I agree with part II of the majority opinion. The
trial court did not abuse its discretion in finding that
plaintiffs' first amended complaint inadequately noti-
fied defendants that plaintiffs sought damages for pul-
monary injuries. Moreover, the trial court did not
abuse its discretion in denying plaintiffs' motion to
amend because of its late date. However, I respect-
fully dissent with respect to part I of the majority
opinion. I would recognize a cause of action for the
loss of an opportunity to avoid physical harm less
than death.

Generally, in an action alleging medical malprac-
tice, the plaintiff has the burden of proving four ele-
ments: (1) the applicable standard of care, (2) the
defendant's breach of that standard, (3) an injury, and
(4) proximate causation between the breach and the
injury. MCL 600.2912a; MSA 27A.2912(1); *Locke v
Pachtman*, 446 Mich 216, 222; 521 NW2d 786 (1994).
Proximate cause requires proof of two separate ele-

ments: (1) cause in fact and (2) legal cause. *Skinner v Square D Co*, 445 Mich 153, 162-163; 516 NW2d 475 (1994); *Moning v Alfono*, 400 Mich 425, 437; 254 NW2d 759 (1977). Generally, to establish the cause-in-fact element, a plaintiff must show that, but for the defendant's action, the injury would not have occurred. *Skinner, supra* at 163.

The lost opportunity doctrine, adopted by this Court for wrongful death cases in *Falcon v Memorial Hosp*,[1] provides an exception to the general rule of proving causation in medical malpractice actions. According to the doctrine, damages are recoverable for the lost opportunity to survive, even though the opportunity was less than fifty percent. *Id.* at 461 (LEVIN, J.). A plaintiff must show only that there is a substantial possibility that the defendant's negligence caused the injury. *Id.* at 469.

Several reasons have been advanced for adoption of the doctrine. First, because medicine is an inexact science, questions regarding causation are not easily answered, especially where a physician's failure to act is alleged to be responsible for the harm. *Falcon, supra* at 455 (LEVIN, J.). Fundamental fairness dictates that the uncertainty be imposed on the tortfeasor, not on the patient. As one commentator has stated:

> But for the defendant's tortious conduct, it would not have been necessary to grapple with the imponderables of chance. Fate would have run its course. A defendant's tort not only destroys a "raffle ticket," in so doing it destroys any chance of ever knowing how that ticket would have fared in the drawing. [King, *Causation, valuation, and chance in personal injury torts involving preexisting con-*

---

[1] 436 Mich 443; 462 NW2d 44 (1990).

*ditions and future consequences*, 90 Yale L J 1353, 1378
(1981).]

Second, the doctor-patient relationship should be
taken into account. Patients retain physicians not
only to cure disease or heal injury, but also to maxi-
mize their chance of recovery and to assuage their
pain and suffering. *Falcon, supra* at 459 (LEVIN, J.).
The lost opportunity doctrine helps ensure that physi-
cians are liable for negligence or gross negligence
that deprives their patients of less than an even
chance of obtaining a better result.

Third, as the Court of Appeals stated, where the
chance of recovery is fifty percent or less, the tradi-
tional rule undermines the loss allocations and deter-
rent functions of tort law.

> If the lost opportunity doctrine is limited to cases only
> involving death, potentially flagrant examples of malprac-
> tice could go uncompensated in cases in which the same
> negligent failure to diagnose or treat results in a lost oppor-
> tunity to avoid egregious harm, i.e., paralysis or coma.
> Thus, the deterrent and loss-allocation functions of tort law
> would be undermined if defendants could escape liability
> for the effects of negligent conduct that cause demonstra-
> ble losses. [210 Mich App 231, 237; 533 NW2d 334 (1995).]

It is of real concern that the application of traditional
concepts of proximate cause may unjustly deny legal
recourse to patients injured by a physician's
negligence.

The majority acknowledges the importance of the
deterrent and loss-allocation functions of tort law.
However, it refuses to jettison the element of causa-
tion in order to gain the lost opportunity's deterrent
effect. In *Falcon*, Justice LEVIN remarked that causa-

tion principles are not discarded where the injury is viewed as the lost chance rather than the ultimate harm. A plaintiff must still establish more-probable-than-not causation. It must be proven that, more probably than not, the defendant reduced the opportunity of avoiding harm. *Falcon, supra* at 462.

The Ohio Supreme Court recently discarded what it proclaimed "the traditionally harsh view" and adopted the loss-of-chance theory. *Roberts v Ohio Permanente Medical Group, Inc*, 76 Ohio St 3d 483, 488; 668 NE2d 480 (1996).[2] It reasoned:

> A patient who seeks medical assistance from a professional caregiver has the right to expect proper care and should be compensated for any injury caused by the caregiver's negligence which has reduced his or her chance of survival. Over the years, medical technology has improved and advances have been made in the treatment of many areas of medicine, including cancer. However, these medical strides are meaningless unless early detection is practiced diligently by those in the health care field. Thus, a health care provider should not be insulated from liability where there is expert medical testimony showing that he or she reduced the patient's chances of survival. Unfortunately, under the traditional view, this is precisely the outcome. The innocent patient is the loser while the health care provider escapes liability despite his or her negligence.

The policy reasons behind the lost opportunity doctrine apply equally to fatal and nonfatal cases. Patients seek treatment from doctors for maladies other than potentially fatal diseases.[3] In both fatal and

---

[2] In doing so, the Ohio court overruled its previous contrary position taken in *Cooper v Sisters of Charity of Cincinnati, Inc*, 27 Ohio St 2d 242; 272 NE2d 97 (1971).

[3] In *Aasheim v Humberger*, 215 Mont 127; 695 P2d 824 (1985), the plaintiff alleged that the defendant's negligence resulted in the plaintiff

nonfatal cases, the patient seeks to improve the opportunity of "avoiding, ameliorating, or reducing physical harm and pain and suffering." *Falcon, supra* at 461 (LEVIN, J.).

The majority fails to explain why the doctrine is proper if death occurs, but not if a lesser injury is involved. It cites Texas and South Carolina Supreme Court cases in support of the argument that traditional notions of causation should not be discarded. *Kramer v Lewisville Memorial Hosp*, 858 SW2d 397 (Tex, 1993); *Jones v Owings*, 318 SC 72; 456 SE2d 371 (1995). However, both cases focused on whether the lost opportunity doctrine should apply where death is the ultimate result. They did not discuss whether, once the lost opportunity doctrine applies, it should be limited to death cases.

Other jurisdictions have adopted a cause of action for the loss of an opportunity to avoid physical harm less than death. In *Aasheim v Humberger*,[4] the plaintiff consulted medically with the defendant physician regarding problems in her left knee. The defendant failed to order x-rays. The plaintiff was diagnosed with chondromalacia. After the condition of her knee did not improve, she was referred to another physician for arthroscopic surgery. Preoperative x-ray films revealed a giant cell tumor in the left knee. Physicians had to remove the infection along with all the bone and soft tissue in the knee area. She was given a prosthetic knee.

---

losing a chance at less radical surgery and a chance to preserve her natural knee.

[4] *Aasheim*, n 3 *supra.*

The plaintiff filed suit for failure to order diagnostic films. She alleged that the error caused her to lose the chance to have less radical surgery and preserve her natural knee. The Montana Supreme Court stated:

> We feel that including "loss of chance" within causality recognizes the realities inherent in medical negligence litigation. People who seek medical treatment are diseased or injured. Failure to diagnose or properly treat denies the opportunity to recover. Including this lost opportunity within the causality embrace gives recognition to a real loss consequence of medical failure. [*Aasheim, supra* at 133.]

In *Ehlinger v Sipes*,[5] parents brought an action against a physician for injuries arising from the premature birth of their twins. They alleged that failure to diagnose multiple pregnancies was a substantial factor causing the injuries. The physician argued that, to satisfy their burden on the causation issue, the plaintiffs had to show that, with proper diagnosis and appropriate treatment, more probably than not (1) the twins would not have suffered their injuries, or (2) the injuries would have been less severe. The Wisconsin Supreme Court rejected the argument, stating:

> We disagree that to establish causation the Ehlingers must show that proper diagnosis and treatment *would* have been successful. We conclude that in a case of this nature, where the causal relationship between the defendant's alleged negligence and the plaintiff's harm can only be inferred by surmising as to what the plaintiff's condition would have been had the defendant exercised ordinary care, to satisfy his or her burden of production on causation, the plaintiff need only show that the omitted treatment was intended to prevent the very type of harm which resulted, that the plaintiff would have submitted to the

---

[5] 155 Wis 2d 1; 454 NW2d 754 (1990).

treatment, and that it is more probable than not the treatment *could* have lessened or avoided the plaintiff's injury had it been rendered. It then is for the trier of fact to determine whether the defendant's negligence was a substantial factor in causing the plaintiff's harm. [*Id.* at 13-14 (emphasis in original).]

In *Delaney v Cade,*[6] the Kansas Supreme Court considered recognizing a cause of action for the loss of a chance of a better recovery as contrasted with the lost chance to survive. After reviewing the policy arguments relating to the lost chance doctrine, the court found that the lost chance of a better recovery stated a legitimate cause of action. It stated:

We have found no authority or rational argument which would apply the loss of chance theory solely to survival actions or to loss of a better recovery actions and not to both. As noted by plaintiff in her brief: "There is certainly nothing in that [*Roberson*] rationale to justify leaving the season open on persons who suffer paralysis, organ loss, or other serious injury short of death while protecting only those who do not survive the negligence."

We acknowledge that the vast majority of cases we have reviewed involved death of the patient and a loss of chance of survival. We also recognize that the apportionment of damages may be more difficult in a loss of a better recovery case than in the cases resulting in death. However, the fact that most cases have involved death of the patient and that damages may be difficult to resolve in a loss of a better recovery case should not be grounds to refuse to recognize the doctrine when medical malpractice has substantially reduced a person's chance of a better recovery. [*Id.* at 210.]

The court acknowledged that several jurisdictions have refused to recognize the loss of chance doctrine

---

[6] 255 Kan 199; 873 P2d 175 (1994).

in either type of case. However, it found no jurisdiction which applied the theory in one type of case and denied it in the other. The court found that most jurisdictions, like Kansas, had simply not had occasion to address the doctrine in both situations.

I agree with the reasoning of the Kansas Supreme Court. Considering the policy arguments underlying the lost opportunity doctrine, there is no rational basis for distinguishing between death cases and cases in which physician negligence has limited recovery. Consequently, I would extend the reasoning of our decision in *Falcon* to nonfatal cases.

CAVANAGH, J. (*dissenting*). I agree with the analysis of the dissent that would recognize a cause of action for the loss of an opportunity to avoid physical harm less than death. However, I also dissent from part II of the majority opinion, which holds that the trial court did not abuse its discretion in denying plaintiff's motion to amend the complaint. The Court of Appeals reversed the trial court on this issue, holding that it abused its discretion in denying the plaintiff's motion to amend her complaint to add an allegation of physical and mental pain and suffering from the aggravation of the pulmonary pathology.

As the Court of Appeals so aptly stated in its opinion:

> Where a motion for summary disposition is grounded on MCR 2.116(C)(10), the trial court is required to give the parties an opportunity to amend their pleadings as provided by MCR 2.118, unless the amendment would be futile. MCR 2.118(A)(2) provides that leave to amend shall be freely given when justice so requires. The rules pertaining to the amendment of pleadings are designed to facilitate amendment except when prejudice to the opposing party would

result. Amendment is generally a matter of right rather than grace. A motion to amend ordinarily should be granted; denial should only be for particularized reasons, such as undue delay, bad faith, dilatory motive, repeated failure to cure deficiency by amendments previously allowed, undue prejudice to the opposing party, or futility.

In this case, the trial court stated:

"The Court is satisfied that this is a 1991 case. The Defendant did not have notice that the general damage element of pain and suffering was specific to the damages arising out of pulmonary pathology. Defendants prepared for trial and the Defendants prepared for mediation, the Court is satisfied, due to the loss of renal function. And despite the Plaintiff's contentions, the Court's satisfied that the Motion for Amendment of the Complaint, Second Amended Complaint, should be denied, and I do so."

However, plaintiff stated in her mediation summary that her damages included the "probability that pulmonary damages would have been minimized such that mechanical ventilation and extensive respiratory therapy would not have been necessary." Plaintiff also alleged in both her original and first amended complaint that on October 23, 1990, she went to defendant Walled Lake Medical Center with a symptom, among others, of "bloody sputum with cough," that she subsequently was admitted to defendant hospital and examined by defendant Khera, and that defendant Khera failed to obtain a timely pulmonary consultation. Defendants Khera and Ferrer both testified in their depositions that Goodpasture's Syndrome affects the lungs and that they observed plaintiff having pulmonary problems. Plaintiff was subsequently placed on a respirator. These facts indicate that defendants had notice of potential pulmonary complications and thus would not have been unduly prejudiced by allowing plaintiff to amend her complaint to allege that her damages included pain and suffering from pulmonary aggravation. Because the amendment would not have prejudiced defendants, the mere fact that this case originated in 1991 is an insufficient reason to deny leave to amend.

Defendants argue that *Dacon v Transue*, 441 Mich 315; 490 NW2d 369 (1992), is on point. In *Dacon*, our Supreme Court upheld the denial of the plaintiff's motion to amend her complaint. However, in that case the plaintiff sought to add a new theory of medical malpractice. The plaintiff had alleged and developed the case on the theory that the defendants prescribed the wrong medicine, and not until trial did she seek to add a theory alleging that the defendants had negligently delayed treating and medicating her. However, *Dacon* is distinguishable. In this case, plaintiff sought the amendment before trial. Moreover, plaintiff's claim of pulmonary damage arises from her original theory that defendants negligently failed to timely diagnose or treat her Goodpasture's Syndrome.

Thus, although allowing the amendment might have affected the result of the trial, it would not have denied defendants a fair trial. Accordingly, the trial court abused its discretion in denying plaintiff's motion to amend. We reverse the trial court's denial of plaintiff's motion to amend her complaint. On remand, the plaintiff is to be allowed to amend her complaint to add an allegation of pain and suffering relating to pulmonary damage. [210 Mich App 231, 240-242; 533 NW2d 334 (1995) (citations omitted).]

I agree with the analysis of the Court of Appeals, and I would affirm its decision on this issue also.