# STATE OF MICHIGAN

# COURT OF APPEALS

RENCO ELECTRONICS, INC.,

        Plaintiff-Appellee,

v

UUSI, LLC, doing business as NARTRON,

        Defendant-Appellant.

UNPUBLISHED
May 11, 2017

No. 331506
Osceola Circuit Court
LC No. 13-013685-CK

Before: SAWYER, P.J., and MURRAY and GLEICHER, JJ.

PER CURIAM.

Nartron placed a very large order for specialty parts to be filled over time by Renco Electronics, and later requested additional product. Nartron later lost its contract with an automobile manufacturer and sought to cancel the remainder of its order. Nartron refused to pay Renco for parts in the production process as required by their contract, precipitating this lawsuit. Nartron challenges the trial court's award in Renco's favor and complains that the court improperly denied its belated request to file a countercomplaint. We discern no error in the trial court's judgment and affirm.

## I. BACKGROUND

Chrysler retained Nartron, an automotive supplier, to make fuel-pump control modules for certain vehicles. Nartron subcontracted with Renco Electronics to make toroidal inductors for use in the modules. The inductor was not a mass-produced Renco product, but a special order designed specifically for this project. Renco enlisted a partner corporation, Ultratek, to manufacture the inductors in a Chinese factory (which was actually owned by Renco). Of import to this case, the inductors include a core made of "compressed and baked powdered iron." Renco purchases such cores from two companies: Micrometals and Karson. The specifications provided by Nartron to Renco required the use of Micrometals cores in its inductors. However, the cores from Micrometals and Karson look identical and according to record evidence "perform the same." The only way to determine the manufacturer of a particular core is to destroy it and conduct a chemical analysis.

At some point during the contract period, a Nartron employee conducted a diagnostic test and observed that one toroidal inductor did not perform as expected. The employee suspected the core was to blame and sent that part to Micrometals for analysis. After testing, Micrometals determined that it had not manufactured the core. Nartron did not report this noncompliance to

Renco. In fact, Nartron specifically considered that Renco had used non-Micrometals cores, generated an internal document waiving this noncompliance, and ordered additional inductors from Renco. In the meantime, Nartron reported other problems to Renco, which Renco remedied.

On July 26, 2013, Chrysler cancelled its order with Nartron for fuel-pump control modules. Nartron contacted all of its subcontractors on the project, including Renco, to cancel its component orders. Renco stopped a production order for 15,000 parts that had not yet been started. However, Renco had even larger quantities of inductors in transit, stored in China waiting to ship, and midway through production. Renco expected Nartron to pay for these parts pursuant to their contract, which provided front and center that special orders were "Non-Cancelable, Non-Refundable." The meat of the contract provided in further detail:

> **Cancellations and Charges.** All custom products are non-cancelable. You may cancel your order within 48 hours at no charge. After 48 hours, your order is non-cancelable, non-returnable. Renco reserves the right to invoice the entire amount of balance of each order upon your request to cancel. At the sole discretion of Renco, the following will apply; a $250 cancellation fee and an invoice for all work in process, completed parts, raw materials, set-up charges, and restocking fees. . . .

Accordingly, Renco demanded $303,720.48 from Nartron.

Nartron refused to pay and Renco filed a breach of contract action in October 2013. Nartron conceded its breach but defended that it would not pay for goods it had not received and that did not conform to contract specifications.

On December 15, 2014, after the close of discovery, Nartron filed a motion for leave to amend its answer and to file a counterclaim. Nartron alleged that the parts were nonconforming because they did not contain a core manufactured by Micrometals. It sought to file a counterclaim for damages connected to Renco's failure to provide conforming goods, including increased labor and shipping costs and other damages. The trial court concluded that Nartron's suggested counterclaim was based on the same facts as its earlier raised affirmative defenses and therefore could have been filed at the outset. In addition, because the discovery process had been lengthy and costly and was now closed, Renco would be prejudiced by the filing of a counterclaim. Therefore, the trial court denied Nartron's motion.

Following a three-day bench trial, the trial court entered a written opinion and order awarding Renco damages in the amount of $303,720.48 plus interest. The court found that Nartron submitted blanket purchase orders for at least 500,000 each of two types of inductors; the specifications for each type of inductor required the use of Micrometals cores. Nartron cancelled the blanket purchase orders on July 26, 2013. Renco was able to stop a recent order for 15,000 inductors without cost to Nartron, but Renco did not timely cancel other pieces previously ordered that were in various stages of production and storage. Renco first learned of Nartron's concern about the non-use of Micrometals cores after Renco filed this action, but Nartron had been aware of the issue for some time, the court noted. Despite knowing that

Micrometals cores were not being used, Nartron continued to order and use the inductors. Nartron did not receive any complaints from Chrysler about the quality of the products.

The trial court continued that Renco and Nartron entered into a contract, but that neither party fully accepted the other's terms and conditions. The contract did not specify a final number of inductors to be manufactured by Renco and purchased by Nartron; at the time Nartron cancelled the blanket purchase orders, Renco had inductors in various stages of production and storage. The terms and conditions set out in Renco's price quote indicated that Renco would charge for work in progress. Nartron's purchase order indicated that if it cancelled the order it would pay for product "completed in accordance with the order" but not yet paid for, and for "the actual costs of work-in-progress and raw materials."

The trial court rejected Nartron's assertion that Renco had breached the contract by using non-Micrometals cores in the inductors, stating:

> Despite the likely use of non-conforming cores by Renco, Nartron's argument fails. Looking to the Uniform Commercial Code as adopted in Michigan, here the contract might fit into several categories, but the category does not impact the outcome. Whether it is an installment contract, a single contract with a particular delivery schedule, or some other variation of a contract, Nartron has not properly established a breach. Nartron did not provide proper notice, as the notice given to Renco was neither timely nor indicative of a non-conformity. The Nartron notice of cancellation to Renco was based upon the loss of a customer, Chrysler, and not upon a shortcoming with the inductors. Any notice regarding a shortcoming with the inductors sufficient to argue for cancellation of the contract without consequence, if it was sent at all, was not sent by Nartron to Renco until the onset of litigation in this case—December 2013. Nartron's notice of cancellation provided in July 2013 pointed to the Chrysler cancellation as the sole reason. Nartron's lack of proper notice is fatal to arguments regarding non-conformity or the lack of a perfect tender regardless of the type of contract present.
>
> Looking to perfect-tender or substantial-impairment-of-the contract concepts, certainly proper notice of the shortcoming is required. Within 30 days, a reasonable period, or some other interval, Nartron did not notify Renco that the incorrect cores were or were likely used in the inductors. The lack of notice deprived Renco of the opportunity to cure or otherwise adjust its manufacturing of the inductors to stop production and limit its losses. Nartron's continued regular acceptance of the inductors is telling when its own report in early 2012 stated an inspection of the cores could not determine if the Micrometals cores had been used, and after Nartron did determine in February and March 2013 that the wrong cores had been used. In fact, Nartron expressly put in place an acceptance of deviation to continue accepting the Renco inductors after it learned the cores were wrong. Testing of the inductors by both Nartron and Renco throughout the relationship found that the inductors met performance expectations, and in the few instances where there were performance shortcomings, Renco addressed and remedied the matter. Chrysler accepted and paid for the product Nartron provided

-3-

and that included the non-Micrometals cores. There was never a complaint or concern in this regard. Nartron suffered no loss or impairment because of the use of the wrong cores. Nartron could have expected perfect tender, but to do so it must have asserted the right on a timely basis.

So, again, we fall to commercial reasonableness and the course of dealings, which may be directly or indirectly established by Renco's paragraph 10 "cancellation and charges" provision, and by Nartron's paragraph 12 "termination" provision. These paragraphs match up in significant ways and provide for payments for completed goods and goods in the process of being completed at the time a contract ends, whatever the terms describing this contract end may be. That is what Renco seeks here. And if these paragraphs do not govern directly, they do govern indirectly by giving support to show the course of dealing or commercial reasonability here. Renco likely tendered non-conforming goods, but Nartron proceeded normally even after discovering the non-conformity. Nartron may have been in a position to assert non-conformity as a defense to paying for later inductor production, but the inductors Renco seeks compensation for here fall within a production time-frame that Nartron purposely let pass without challenge.

## II. BREACH OF CONTRACT

Nartron argues that the trial court erred in finding that Nartron was liable to Renco for the parts still in production. Nartron contends that because Renco delivered nonconforming goods (inductors without Micrometals cores) and failed to cure the deficiency, and Nartron's conduct was not wrongful, Renco is not entitled to payment for the goods still in production. We review for clear error a trial court's findings of fact in a bench trial, and review de novo its conclusions of law. *Ross v Auto Club Group*, 481 Mich 1, 7; 748 NW2d 552 (2008).

Both parties rely upon the Uniform Commercial Code (UCC), MCL 440.2101 *et seq.*, to support their claims of right upon appeal. Nartron contends that Renco bore a duty to deliver goods in compliance with the parties' contract pursuant to MCL 440.2301 and that it was only required to pay for goods that complied with the contract. Relying on the "perfect tender rule," Nartron further asserts that if goods "fail in any respect to conform to the contract," the buyer is not obligated to accept all or any part of the goods. MCL 440.2601. However, Nartron concedes that "[r]ejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller." MCL 440.2602. Nartron further admits that a buyer may be deemed to have waived an objection to nonconforming goods under MCL 440.2605, which provides, in relevant part:

(1) A buyer's failure to state in connection with rejection a particular defect that is ascertainable by reasonable inspection precludes the buyer from relying on the unstated defect to justify rejection or to establish breach if either of the following applies:

(a) The seller could have cured the defect if the buyer stated the defect seasonably.

-4-

We discern no error in the trial court's determination that Nartron essentially waived its right to reject the inductors in question. Nartron cited no defect when cancelling its contract with Renco; rather, Nartron cited only Chrysler's cancellation of its order for fuel-pump control modules. Although the inductors' deviation from the contract was not ascertainable by reasonable inspection, Nartron actually discovered the "defect." Nartron created internal documentation acknowledging that the inductors did not conform to the contract specifications, but that it intended to continue its contract with Renco. Nartron even ordered additional inductors after learning of the nonconformity. Only after Renco filed this lawsuit did Nartron inform Renco that it learned the parts were nonconforming. Had Nartron advised Renco when it discovered that Micrometals cores were not being used, Renco could have remedied the defect in future inductors. Given this evidence, we discern no error in the trial court's determination that Nartron breached its end of the contract and waived its right to complain about Renco's breach.

This conclusion is further supported by MCL 440.2612. If we accept Renco's characterization of the parties' agreement as an installment contract, Nartron could reject a nonconforming installment if the nonconformity "substantially impair[ed] the value of that installment and [could not] be cured[.]" MCL 440.2612(1). There is no evidence that Nartron suffered any impairment by receiving inductors that did not have Micrometals cores. Renco could have cured the defect for the remainder of the ordered parts had Nartron provided timely notice. Accordingly, Nartron could not reject installments under the contract.

Ultimately, the court could presume based on the evidence that had Chrysler not cancelled its module order, Nartron would have used Renco's inductors in production without incident. Nartron could not show that the value of a nonconforming shipment would have been substantially impaired. This is especially true given that Nartron discovered in early 2013 that the inductor cores were not made by Micrometals, but nevertheless continued to order inductors from Renco and use them in products for Chrysler.

III. PROOF OF DAMAGES

Nartron further challenges the admissibility of the evidence supporting the trial court's damages award. The documents outlining the number of inductors in storage, transit and production were not authenticated, Nartron asserts, and no Renco witness had firsthand knowledge of the information contained within. We review for an abuse of discretion a trial court's decision to admit or exclude evidence, *Edry v Adelman*, 486 Mich 634, 639; 786 NW2d 567 (2010), and review de novo a preliminary question of law regarding the admissibility of evidence. *Waknin v Chamberlain*, 467 Mich 329, 332; 653 NW2d 176 (2002). However, an error in the admission of evidence is not grounds for vacating a judgment unless the failure to do so appears to be "inconsistent with substantial justice." MCR 2.613(A).

Nartron argues that Renco's exhibits 44, 46, and 48 were inadmissible because they contained hearsay. Specifically, Nartron asserts that Edward Rensing, the President of Renco and the author of the documents, lacked personal knowledge of the information contained therein, and thus could not testify as to the authenticity of that information. The subject exhibits were admitted during Rensing's testimony. The first was an August 5, 2013 letter from Rensing to Nartron's purchasing agent giving an "accounting of all the individual stages and places where the product was in the pipeline." The second was a letter penned by Rensing explaining that the

parts already produced and in production could not be salvaged for scrap because the cost of extricating salvageable materials exceeded their value. The third was an "age trial balance" sheet giving an "accounting of all the money" owed by Nartron.

"Hearsay" is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Hearsay is inadmissible unless an exception applies. MRE 802. The trial court did not identify a hearsay exception when admitting the challenged documents. And Renco did not assert that the documents were admissible as records kept in the ordinary course of business. MRE 803(6). In its written decision, however, the trial court noted that Rensing gave detailed testimony about Renco's system for tracking production. The court found that this testimony supported that the system, and the data based on the system, were reliable. Essentially, the trial court found that Rensing's testimony regarding the production system and his use of Renco's computer system to track the progress of orders was based on his personal knowledge.[1] Rensing refreshed his recollection regarding the status of parts in production by referring to the documents. Accordingly, the court's judgment was actually based on Rensing's testimony regarding his knowledge and not the documents themselves.

Even if the trial court erred in ruling that the documents were admissible, it did not err in relying on Rensing's testimony based on his personal knowledge. The trial court had sufficient admissible evidence on which to base its calculation of the damages award. Therefore, any error in the admission of the documents was harmless and does not warrant reversal. MCR 2.613(A).

## IV. AMENDMENT OF ANSWER/COUNTER-COMPLAINT

Finally, Nartron argues that the trial court erred in denying its motion for leave to amend its pleadings to file a counterclaim. We review for an abuse of discretion a trial court's decision on a motion to amend pleadings. *Casey v Auto Owners Ins Co*, 273 Mich App 388, 400-401; 729 NW2d 277 (2006).

MCR 2.118(A)(2) provides that leave to amend "shall be freely given when justice so requires." Nartron filed its motion to amend and to file a counterclaim more than a year after it filed its answer and affirmative defenses. Nartron argues that Renco would not have been unduly prejudiced by the filing of a counterclaim because the parties had conducted discovery on the issue of the nonconformity of the goods and the amount owed by Nartron to Renco.

Nartron contended that its discovery that the cores used in Renco's inductors came from Karson and not Micrometals would serve as the basis for the counterclaim, and that it did not possess that information when it filed its answer and affirmative defenses. This is inaccurate. Nartron knew that Renco's partner Ultratek was using Micrometals cores long before this suit was filed. Nartron therefore had the information to file its counterclaim at the time it drafted, filed, and served its answer and defenses. Instead, Nartron waited until discovery was complete, preventing Renco from directing inquiries more specifically at this issue. Given the timing, the

---

[1] Nartron does not dispute this finding.

court could deny Nartron's motion for "undue delay." See *Weymers v Khera*, 454 Mich 639, 659; 563 NW2d 647 (1997).

Delay alone is often insufficient to warrant denying a motion to amend the pleadings. *Id.* In this case, denial of Nartron's motion was further supportable because it was futile. See *Richard v Schneiderman & Sherman, PC*, 297 Mich App 271, 275; 824 NW2d 573 (2012). The evidence gathered during discovery showed that Nartron knew the inductors did not conform to contract specifications and expressly chose to continue the contract with the produce as-is. Under the circumstances, the trial court did not abuse its discretion by denying as untimely Nartron's motion to amend.

We affirm. As the prevailing party, Renco may tax costs pursuant to MCR 7.219(A).

/s/ David H. Sawyer
/s/ Christopher M. Murray
/s/ Elizabeth L. Gleicher

-7-