*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ROBERT HARRIS, Individually and as Personal
Representative of the ESTATE OF MARGARET JO
HARRIS,

        Plaintiff-Appellant,

v

DLP MARQUETTE GENERAL HOSPITAL, LLC,
doing business as UP HEALTH SYSTEM
MARQUETTE, SURGICAL ASSOCIATES OF
MARQUETTE, PC, and DR. RYAN D.
EDWARDS,

        Defendants-Appellees.

UNPUBLISHED
May 25, 2023

No. 361180
Marquette Circuit Court
LC No. 19-057829-NH

Before: RICK, P.J., and SHAPIRO and O'BRIEN, JJ.

PER CURIAM.

In this medical malpractice action, plaintiff, Robert Harris, individually and as personal representative of the Estate of Margaret Jo Harris, appeals as of right the trial court's order granting summary disposition under MCR 2.116(C)(10) (no genuine issue of material fact) to defendants-appellees, DLP Marquette General Hospital, LLC (MGH), doing business as UP Health System Marquette, Surgical Associates of Marquette, PC, and Dr. Ryan D. Edwards. We reverse and remand for further proceedings.

## I. BACKGROUND

This action arises from the death of decedent, Margaret Jo Harris. Her untimely and abrupt passing occurred following a bowel obstruction that led to perforation of the bowel and septic shock, among other serious complications. Decedent first presented with signs of a bowel obstruction at St. Francis Hospital in Escanaba, Michigan, on April 26, 2016, after being sent there following a visit with her primary care physician. In the month leading to her hospitalization, decedent had experienced bouts of nausea, abdominal pain, weakness, vomiting, and diarrhea. Based on CT scan results, decedent's doctors determined that she had a dilated stomach and small

bowel consistent with a small bowel obstruction. Decedent was placed on a nasogastric (NG) tube to drain her stomach and was transferred to MGH on April 27, 2016, per her family's request.

Upon arrival at MGH, Dr. Anna E. Reese completed a medical history and physical evaluation of decedent. Dr. Reese noted that decedent was suffering from a small bowel obstruction, which was consistent with the CT scan findings from St. Francis Hospital. She concluded that decedent was at risk of developing "potential complications with perforation of small bowel" and "the risk for development of septic shock" as a result of the obstruction. Decedent was scheduled for a surgical consult, which was conducted that same day by defendant, Dr. Edwards. After reviewing decedent's lab results and CT scan images, Dr. Edwards observed that decedent's white blood cell (WBC) count was significantly elevated at 27,700 cells per microliter of blood, which is typically recorded as 27.7.[1] According to Dr. Edwards, decedent's high WBC count was "the only thing of significance that might indicate an issue in her abdomen." However, he also noted that decedent's CT scan showed "matted bowel loops," inflammation and both collapsed and dilated areas of the bowel, but stated that it was "hard to tell if it [was] something that [was] going to require surgery to correct." Finally, Dr. Edwards observed that decedent exhibited no clinical or radiographic signs to suggest that she required emergency surgery. After meeting with Dr. Edwards, decedent agreed to wait a day or two before moving on to more aggressive treatment.

Dr. Edwards followed up with decedent on April 28, 2016, at 8:30 a.m. and 6:45 p.m., and on April 29, 2016, at 7:30 a.m. He did not see her in the evening on April 29, 2016, and never saw her on April 30, 2016; a hospitalist met separately with her that day instead. Decedent's WBC count fluctuated over those three days. On April 28, 2016, her WBC count was 19; on April 29, 2016, it went up to 23; and on April 30, 2016, it dropped back down to 16.9. At all times, however, decedent's WBC count was well above normal, despite treatment with broad-spectrum antibiotics. On May 1, 2016, decedent suddenly experienced acute abdominal pain, and a second CT scan was ordered. The CT scan showed that decedent had "a perforation probably in the upper abdomen[.]"

On May 1, 2016, Dr. Joseph C. Jameson, Dr. Edwards's partner, conducted a surgical consultation with decedent and ultimately performed a laparotomy the same day in an attempt to repair her ruptured bowel and remove the bowel contents that had escaped into her abdomen. Between May 1, 2016, and May 17, 2016, decedent underwent several more abdominal surgeries. Defendant was discharged at the request of her family on May 17, 2016, and arrangements were made for in-home hospice care. Dr. Bradford K. Grassmick, M.D., wrote a discharge summary indicating that decedent had "undergone multiple abdominal surgeries for perforated viscus with a long[,] complicated course, which required repair of an anastomotic leak but was found on re-exploration to have an additional perforation, which was washed out and over-sewn." Dr. Grassmick further explained that "[r]e-exploration . . . revealed 4 more perforations as well as

---

[1] For reference, a test that measures white blood cell count is used to calculate the number of white blood cells per milliliter of blood. The average healthy person's white blood cell count typically "ranges between 4,000 and 11,000 cells per microliter" of blood. David C. Dale, *Overview of White Blood Cell Disorders*, <https://www.merckmanuals.com/home/blood-disorders/white-blood-cell-disorders/overview-of-white-blood-cell-disorders> (accessed May 2, 2023).

densely matted intestine, which was unresectable," and indicated that decedent's discharge diagnosis was "[p]erforated viscus and septic shock." Decedent died 15 days later, on June 1, 2016.

On March 28, 2019, plaintiff filed a claim of medical malpractice against Dr. Edwards, his medical practice, and MGH, the hospital health system. As relevant to this appeal, plaintiff alleged that Dr. Edwards failed "to timely and properly comply with the standard of practice" because he "negligently failed to diagnos[e] and treat [decedent] for bowel obstruction and acute infectious process." Additionally, plaintiff alleged that defendants Surgical Associates of Marquette, PC, and MGH failed to select, employ, train, and monitor their employees to ensure they were competent to provide adequate medical care to decedent. Plaintiff alleged that defendants breached these duties, and as a direct and proximate result, the "acute infection within [decedent's] abdominal cavity went undiagnosed and untreated, spread systematically, and resulted in sepsis and death."

Plaintiff presented two expert witnesses to support the claims stated in the complaint. Plaintiffs' first expert, Dr. Katherine Trahan, M.D., testified at her deposition that the standard of care did not require Dr. Edwards to perform surgery on decedent before May 1, 2016, but that it *did* require Dr. Edwards to investigate the sudden increase in decedent's WBC count on April 29, 2016, either by performing a CT scan, exploratory laparoscopic surgery, or a more invasive exploratory laparotomy. Dr. Trahan testified that any of these procedures would have more likely than not demonstrated the need for surgical treatment of the obstruction in order to avoid imminent bowel perforation. According to Dr. Trahan, if Dr. Edwards adhered to the requirements of the standard of care, he more than likely would have discovered "persistent intra-abdominal process and . . . whether [there was] still a bowel obstruction or ischemia" before it resulted in perforation of plaintiff's intestines. Dr. Trahan testified that if Dr. Edwards had taken any steps to investigate the changes in decedent's condition, the bowel perforation and her resulting death likely could have been avoided.

Dr. Trahan also noted that the CT scan done on April 26, 2016, was "most suggestive of an intraabdominal abscess or ischemia" either of which can lead to perforation. Nevertheless, according to Dr. Trahan, Dr. Edwards had "no plan other than just, 'Hey, clamp her NG tube, pull it, and let's see what happens.'" Dr. Trahan continued:

> He did not do any subsequent investigation into the cause of the presenting sepsis with abdominal pain. . . .
>
> So it's the lack of further investigation to ensure the bowel—small bowel obstruction was resolving and lack of investigation as to the cause of the abdominal sepsis that she presented with.

Dr. Trahan characterized the lack of investigation as "the biggest breach in the standard of care."

Plaintiff's second expert, Dr. Jesse Hall, M.D., provided the following testimony regarding the issue of causation:

> [W]ith the use of decompression fluids and antibiotics, some of the evolving inflammatory and infectious complications of this mass of stool and threatened

bowel improved, but it was not definitively addressed in any way which would require surgery ultimately, and as a consequence, despite receiving antibiotics and despite having her bowel evacuated, when [decedent] went back on oral intake on the 28th, she began to move again in the direction of obstruction, this time severe, more severe than any of her prior episodes, and that moving in this wrong direction was, first of all, something that ought to have been anticipated because no one had a definitive explanation for why she was in trouble in the first place and was signalled [sic] as well on the 29th by her white blood cell counts going back up to a very high level despite antibiotics and her beginning to be acidotic.

When no one changed the course from that point forward, meaning re-imaging her and then making a plan or conducting surgery . . . and she continued to take things in orally, she developed again an obstructed swollen bowel that perforated late on April 30th or in the morning of the 1st and she now progressed rapidly, as you would expect, into septic shock and multisystem organ failure such that despite having a surgery to address the perforation, it really couldn't be primarily repaired on the 1st. It was essentially a clean-out operation followed by another clean-out operation on the 2nd and then, in fact, additional surgeries on I think the 15th and one other date, and never was there really viable bowel to work with . . . and all of those things are a result of her septic shock . . . . If you'd done surgery 24, 48 hours earlier or at any earlier point, and, again, I'm just saying if you had, it's up to a surgeon to determine that you should have, you would have gotten an adequate surgical repair and spared her all of the problems of infection.

So she died from her bowel pathology . . . because the bowel pathology became complicated by perforation and the perforation became complicated by septic shock which makes it essentially impossible for her to recover . . . .

Dr. Hall further stated that had decedent's bowel "not perforated, she wouldn't have septic shock and multisystem organ failure and she could have recovered from surgery done earlier." He believed that although decedent "had some significant medical problems . . . she would likely [have] live[d] a decade or so."

Defendants Surgical Associates and Dr. Edwards moved the trial court for summary disposition pursuant to MCR 2.116(C)(10), and defendant MGH filed a concurrence and joinder motion to the motion for summary disposition. Defendants argued that the testimony of plaintiff's experts regarding the causal chain of events between Dr. Edwards's alleged breach of the standard of care and decedent's death were entirely speculative and did not establish factual causation. Defendants explained that according to Dr. Trahan's deposition testimony, Dr. Edwards needed to take at least one of three different actions to comply with the standard of care to investigate decedent's WBC count. Defendants argued that to establish causation, plaintiff would have to establish that had Dr. Edwards complied with the standard of care, surgery would have been performed prior to the perforation. However, said defendants, it was speculative to assume that any potential course of action—including investigating decedent's elevated WBC count on April 29, 2016—would have caused Dr. Edwards to choose to perform surgery before decedent's bowel perforated on or around May 1, 2016.

In response, plaintiff argued that according to Dr. Trahan's testimony, there were several ways that Dr. Edwards could have investigated the rise in decedent's WBC count and that while any one of them would have been adequate, failing to do any of them violated the standard of care. Dr. Edwards breached the standard of care by completely failing to investigate. Plaintiff disagreed with defendants' characterization of the argument, stating that rather than focusing on whether Dr. Edwards would have performed surgery before decedent's bowel was perforated, plaintiff merely had to establish that decedent would not have died if Dr. Edwards had investigated the source of decedent's suddenly increasing WBC levels. Plaintiff argued that Dr. Trahan's testimony established that if Dr. Edwards had investigated and attempted to solve the root cause of the issue, decedent would not have suffered a perforated bowel and likely would have survived the obstruction.

The trial court ultimately granted defendants' motions for summary disposition on the ground that plaintiff failed to establish causation. The trial court characterized Dr. Trahan's testimony on the standard of care as "somewhat confusing," noting that although Dr. Trahan testified that Dr. Edwards breached the standard of care on April 29, 2016, by not investigating decedent's elevated WBC count, Dr. Trahan "also conceded that the standard of care did not require Dr. Edwards to perform surgery on [decedent's] bowel at any point prior to the May 1st, 2016 perforation." The court ultimately found Dr. Trahan's testimony "generalized and speculative," stating that "[p]laintiff's expert's theory of causation amounts to mere speculation as to a possible causal link—linking Dr. Edwards['] alleged negligence and [decedent's] eventual death." Furthermore, the court found that plaintiff "failed to demonstrate that [decedent's] injuries could not have occurred absent Dr. Edwards' negligence, which is required to demonstrate factual but for causation in a medical malpractice case." The trial court subsequently entered an order granting summary disposition to defendants. This appeal followed.

## II. ANALYSIS

Plaintiff argues that the trial court erred by granting defendants' motion for summary disposition where plaintiff's expert testimony showed that but for Dr. Edwards's inaction, decedent's bowel perforation and death would not have occurred. We agree.

This Court reviews de novo a motion for summary disposition under MCR 2.116(C)(10). *Dextrom v Wexford Co*, 287 Mich App 406, 416; 789 NW2d 211 (2010). A court properly grants a motion pursuant to MCR 2.116(C)(10) when there is no genuine issue with respect to any material fact and the moving party is entitled to judgment as a matter of law. *Id*. at 415. This Court must examine the documentary evidence presented and, drawing all reasonable inferences in favor of the nonmoving party, determine whether a genuine issue of material fact exists. *Id*. at 415-416. A genuine issue of material fact exists when reasonable minds could differ as to the conclusions to be drawn from the evidence. *Id*. at 416.

A plaintiff must establish four elements to succeed on a cause of action for medical malpractice. These elements include:

> (1) the appropriate standard of care governing the defendant's conduct at the time
> of the purported negligence, (2) that the defendant breached that standard of care,
> (3) that the plaintiff was injured, and (4) that the plaintiff's injuries were the

proximate result of the defendant's breach of the applicable standard of care. [*Craig v Oakwood Hosp*, 471 Mich 67, 86; 684 NW2d 296 (2004).]

Plaintiff's argument on appeal focuses solely on the issue of causation. To successfully establish causation, plaintiff must prove, by a preponderance of the evidence, "the existence of both cause in fact and legal cause." *Weymers v Khera*, 454 Mich 639, 647; 563 NW2d 647 (1997), citing *Skinner v Square D Co*, 445 Mich 153, 162-163; 516 NW2d 475 (1994); see also *Craig*, 471 Mich at 86. Our Supreme Court explained the difference between cause in fact and legal cause in *Skinner*, 445 Mich at 163:

> The cause in fact element generally requires showing that "but for" the defendant's actions, the plaintiff's injury would not have occurred. On the other hand, legal cause or "proximate cause" normally involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences. [Citations omitted.]

Put differently, to show proximate cause, a "plaintiff must present evidence demonstrating a causal link between a defendant's professional negligence and the plaintiff's injury." *Estate of Taylor by Taylor v Univ Physician Group*, 329 Mich App 268, 278; 941 NW2d 672 (2019).

"While a plaintiff need not prove that an act or omission was the *sole* catalyst for his injuries, he must introduce evidence permitting the jury to conclude that the act or omission was *a* cause." *Craig*, 471 Mich at 87. Where, as here, we are dealing with the *failure* to act, it must be noted that "[g]enerally, an act or omission is a cause in fact of an injury only if the injury could not have occurred without (or 'but for') that act or omission." *Id*. "[C]ircumstantial evidence may suffice to demonstrate but-for causation, as long as the circumstantial evidence lead[s] to a reasonable inference of causation and [is] not mere speculation." *Estate of Taylor*, 329 Mich App at 278 (alterations in original). This Court has provided guidance on what constitutes speculation or conjecture:

> As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference. There may be 2 or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any 1 of them, they remain conjectures only. On the other hand, if there is evidence which points to any 1 theory of causation, indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence. [*Ykimoff v W A Foote Mem Hosp*, 285 Mich App 80, 88; 776NW2d 114 (2009) (quotation marks and citations omitted).]

Ultimately, to succeed on a medical malpractice claim, the plaintiff must bring forth proof that amounts to "a reasonable likelihood of probability rather than a possibility. The evidence need not negate all other possible causes, but such evidence must exclude other reasonable hypotheses with a fair amount of certainty." *Skinner*, 445 Mich. at 166 (internal quotation and citation omitted). "Summary disposition is not appropriate when the plaintiff offers evidence that shows that it is more likely than not that, but for defendant's conduct, a different result would have

obtained." *Robins v Garg (On Remand)*, 276 Mich App 351, 362; 741 NW2d 49 (2007) (citation and quotation marks omitted).

Plaintiff theorizes that decedent's death was caused by Dr. Edwards's failure to investigate the cause of decedent's high WBC count. Decedent's WBC count never dropped to a normal level during her hospitalization, and alarmingly jumped from 19 on April 28, 2016, to 23 on April 29, 2016, before dropping to 16.9 on April 30, 2016. According to Dr. Trahan:

> [A] normal prudent surgeon in this situation is obligated to investigate what the cause of this white count is, investigate what is causing her bowel obstruction because she has never had surgery before. This is more likely than not related . . . .
>
> \* \* \*
>
> The breach is not investigating. A normal, reasonable, prudent surgeon in this same situation, with [decedent's] presentation, would have further investigated: a white count going back up to 23, lack of full resolution, she is too weak to get out of bed, she is not eating much. A reasonable, normal, prudent surgeon more likely than not would have ordered a CAT[2] scan.
>
> Now, are there some surgeons that are going to come back and say, "At this point I would have offered her an operation?" Does that make them wrong? No.
>
> So if you divide that out and just ask a—just an isolated question, "oh, did he have to get a CAT scan?" Well, no, because he could have operated. Did he have to operate? No, he could have gotten a CAT scan.
>
> Doing nothing is the breach in the standard of care.

Dr. Jameson, Dr. Edward's partner, who conducted the May 1, 2016, surgery testified that it was probable that between the last time Dr. Edwards came to see decedent on the morning of April 29, 2016, and the perforation two days later on May 1, 2016, her abdominal exam would have changed for the worse. He also attested that until a definitive decision is made that surgery is not required, the standard of care requires that the consulting surgeon see the patient daily or arrange for a partner to do so, something that Dr. Edwards failed to do on April 30, 2016, the last date on which the perforation could have been avoided by surgery. Dr. Jameson further testified that upon opening decedent's abdomen during surgery, he discovered that the condition of her bowel was a "disaster." He found "severe inflammatory adhesions involving all of the bowel within the abdominal cavity," such that parts of the bowel could not even be identified. He conceded that it would have taken several days for the condition of decedent's bowel to progress to that point and that decedent had "been ill for some time."

---

[2] A "computed axial tomography scan," or CAT scan, is the same procedure as a "computed tomography scan," also known as a CT scan; the CT scan is often colloquially referred to as a CAT scan.

Defendants argue that rather than focusing on Dr. Edwards's failure to investigate the cause of decedent's elevated WBC count and continued symptoms, the inquiry into whether he breached the standard of care should center on whether he should have performed surgery before May 1, 2016, given what he knew about decedent's condition. To that end, defendants contend that plaintiff cannot establish causation because Dr. Trahan agreed that surgery was not necessary before May 1, 2016. But this overlooks Dr. Trahan's testimony that although surgery was not mandated by the standard of care given what was known to Dr. Edwards on April 28, 2016, by failing to investigate further—as the standard of care required—Dr. Edwards failed to discover the information that would have made it obvious that surgery was required. And by neglecting to see decedent on April 30, 2016, he failed to recognize her worsening condition. Thus, defendants' insistence that decedent did not require surgery before May 1, 2016, entirely ignores that an investigation would have had to precede any surgical treatment.

Defendants point out that Dr. Trahan agreed that the standard of care did not require Dr. Edwards to conduct a CT scan of decedent's abdomen, or any other specific course of action other than conducting a general investigation. But this also misrepresents Dr. Trahan's testimony. Dr. Trahan attested that there were numerous things Dr. Edwards could have done that would have resulted in pre-perforation surgery, including a CT scan, an investigatory laparoscopy, or even a more invasive laparotomy. Dr. Trahan specifically testified that by doing none of these things, Dr. Edwards breached the standard of care. Put differently, in defendants' eyes, Dr. Edwards could not have violated the standard of care because he was not specifically required to perform *any* particular action. But this misses the point. Dr. Trahan made clear that while only one of these steps had to be taken, a failure to do any of them was a violation of the standard of care.

Defendants' argument boils down to the contention that, because the standard of care did not require Dr. Edwards to perform one specific investigatory action, it was not a violation of the standard of care for Dr. Edwards to fail to investigate decedent's condition at all. This argument is meritless. Dr. Trahan unequivocally stated that the standard of care required Dr. Edwards to investigate the cause of decedent's worsening condition, including her elevated WBC count. Decedent presented at MGH with signs of a bowel obstruction and sepsis. The medical notes from St. Francis hospital expressly indicated that she was at risk of perforation. Decedent's condition did not resolve over several days, despite treatment with antibiotics, and her condition *worsened* on April 29, 2016. Had Dr. Edwards investigated the cause of decedent's sudden uptick in WBC count on that date, it is more likely than not that he would have discovered that the obstruction and infection was severe enough to present an imminent risk of perforating her bowel. The perforation likely could have been prevented.

Although defendants focus on whether Dr. Edwards was required to operate on decedent, they miss the point that Dr. Edwards would have had to investigate decedent's condition to determine whether surgical intervention would have been required. According to Dr. Trahan, decedent's bowel likely perforated sometime on April 30, 2016, as evidenced by a sudden drop in WBC count, which inexplicably went from 23 on April 29, 2016, to 16.9 on April 30, 2016. At that point, it was too late to save decedent from suffering septic shock. Dr. Hill, plaintiff's second expert, agreed with this assessment. Dr. Hill noted that "[decedent] developed an obstructed swollen bowel that perforated late on April 30th or in the morning of the 1st and she now progressed rapidly . . . into septic shock and multisystem organ failure," which in his opinion "really couldn't be primarily repaired on the 1st." The testimony of plaintiff's experts sets forth

an evidence-based analysis leading to the conclusion that Dr. Edwards's failure to investigate decedent's continued abnormal WBC count and its sudden increase after feeding was resumed, despite the continued administration of broad-spectrum antibiotics, was a proximate cause of the intestinal perforation that undisputedly led to decedent's death two weeks later.[3]

### III. CONCLUSION

Viewing the record in the light most favorable to plaintiff, we conclude that there is sufficient evidence to establish a question of fact that but for Dr. Edwards's failure to investigate, decedent likely would not have suffered a perforated bowel or any of the attendant complications thereof. Furthermore, we find that reasonable minds could differ as to whether Dr. Edwards's failure to examine decedent or investigate her WBC count between April 29, 2016, and April 30, 2016, was a proximate cause of decedent's injuries, given that decedent sustained a perforated bowel sometime in the late hours of April 30, 2016, or early on May 1, 2016. Accordingly, defendants were not entitled to summary disposition under MCR 2.116(C)(10).

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Michelle M. Rick
/s/ Douglas B. Shapiro
/s/ Colleen A. O'Brien

---

[3] Defendant suggests that this case is comparable to the facts of *Glinski v Cardiovascular Clinical Assoc*, unpublished per curiam opinion of the Court of Appeals, issued April 30, 2019 (Docket No. 334227). We disagree. Plaintiff presents a simple causation theory: Dr. Edwards failed to take any action to determine decedent's status despite the increasing white count and plaintiff's intestines perforated as a result. By contrast, in *Glinski*, we described the claimed chain of causation as follows:

> Plaintiffs' theory is that if [Dr.] Rasak had prescribed anticoagulants in 2014, Glinski likely would still have experienced hematuria, and likely would have consulted a urologist, but the urologist likely would have consulted Rasak before discontinuing the anticoagulants, which likely would have led to Rasak prescribing a bridging anticoagulant during the surgical procedures, and then Glinski likely would have resumed the anticoagulant after the surgeries, and the anticoagulant likely would have prevented the stroke. This is a lengthy chain of causation, to say the least, and appears to involve more than a fair amount of speculation that each of these events would have occurred in the order listed. [*Id*. at 6.]