*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MARCUS GRIFFEY,

       Plaintiff-Appellant,

v

IONIA COUNTY COMMUNITY MENTAL
HEALTH d/b/a RIGHT DOOR FOR HOPE
RECOVERY AND WELLNESS,

       Defendant-Appellee.

UNPUBLISHED
June 22, 2023

No. 361751
Kent Circuit Court
LC No. 21-005074-CZ

Before: GLEICHER, C.J., and RICK and MALDONADO, JJ.

PER CURIAM.

Right Door for Hope, Recovery and Wellness terminated Marcus Griffey's employment shortly after Griffey filed a report with a public body of suspected malpractice and violations of the Public Health Code. Griffey failed to create a triable question of fact that he engaged in a protected activity as contemplated by the Whistleblower's Protection Act. The record evidence could support a claim that Griffey's termination violated public policy. We affirm the summary dismissal of the WPA claim, reverse the implicit denial of Griffey's motion to amend his complaint, and remand for continued proceedings.

## I. BACKGROUND

Marcus Griffey is a licensed master's degree social worker. From 2017 through 2021, Griffey worked as a Mental Health Clinician II for The Right Door for Hope, Recovery and Wellness (Right Door). Right Door serves as the community mental health agency in Ionia County. Right Door terminated Griffey's employment on March 17, 2021. Griffey asserted that Right Door wrongfully terminated him for reporting the agency's "suspected violations of laws, rules and regulations regarding the treatment of a patient for which [he] was responsible" in violation of the Whistleblower's Protection Act (WPA), MCL 15.361 *et seq.* Griffey accused Right Door of failing to properly manage the case of a man whom Griffey believed to be a danger to himself and others. Right Door countered that Griffey reported alleged malpractice, not illegal

conduct, and therefore was not protected by the act. Right Door further asserted that Griffey was terminated because of poor work performance, not because of his report.

As noted, Griffey began working at Right Door in 2017. In 2019, Right Door placed Griffey on a corrective action plan (CAP). Griffey's supervisor at the time of his termination, Kris Hamilton, and his supervisor at the time of the CAP, Teresa Kiser, noted Griffey's failure to attend meetings, complete required training, and properly document services. Moreover, Griffey did not take supervision or instruction well. Griffey signed a CAP agreeing to submit progress notes in a timely fashion, have more frequent contact with the patients in his caseload, keep his supervisors advised of his appointments, ensure that clients signed necessary paperwork, and "make attendance at meetings . . . a priority." In the fall of 2020, Kiser repeatedly reminded Griffey to submit his weekly contacts sheets so she could approve his time sheets. Kiser further gave Griffey extensions to secure signatures on required documents, reminding him on more than one occasion. Right Door also produced evidence that Griffey was three years overdue for CPR and First Aid training, and was several months overdue for six other mandatory training programs in 2020. He had not rectified this condition by the time of his termination, and was then overdue on a seventh. No other employee rose to this level of delinquency in training.

In late 2020 or early 2021, KC was transferred to Griffey's caseload, and Hamilton took over as Griffey's direct supervisor. In January 2021, Griffey reported to Hamilton "that he was experiencing a significant amount of stress in his personal life and work-related stress" and asked to be limited to a 32-hour work week. That request was denied.

KC was a 29-year-old man who suffered from schizoaffective disorder and experienced hallucinations. KC was noncompliant with his medical plan and avoided coming to Right Door on a monthly basis for injections of psychotropic medications. Griffey described:

> Tensions began to rise with KC when he was hospitalized in mid-January for noncompliance on his treatment order. He was placed at Mercy Health Hackley and showed very little improvement in his psychiatric symptoms while there. It was during this time that I began inquiring about placement in [Kalamazoo Psychiatric Hospital (KPH)].[1]

In February 2021, Hamilton discussed Griffey's work performance with him, including his failure to send documents to clients for signatures and failure to adequately maintain his caseload. Around the same time, a disagreement arose regarding the proper care of KC. As described by Griffey:

> Unfortunately, KC's case would become more complicated. Between the hospitalization at Mercy Health Hackley and his hospitalization at Pine Rest [Christian Mental Health Services Residential Psychiatric Unit], the agency's plan was to have KC get a guardian and placed in a specialized [Adult Foster Care

---

[1] KPH is a state owned and operated in-patient psychiatric facility. See <https://www.michigan.gov/mdhhs/keep-mi-healthy/mentalhealth/mentalhealth/mentalillness/state-operated-hospitals/kalamazoo-psychiatric-hospital_1> (accessed May 24, 2023).

(AFC)] home. . . . We had an extremely difficult time determining what we could and could not do with his treatment order mandating "all recommended services" [as a result of] KC refusing to sign any consents. It was ultimately determined that we could not talk to anyone, including guardianship agencies without his consent.

I was told to contact Mid-Michigan Guardianship Services by using "John Doe" and . . . just an overview of symptoms. Their CEO . . . contacted me back soon after and refused to take the case based on acuity and risk to their agency. This ceased finding a guardian/AFC home at the time and we were unsure of what to do with KC at this point. KC was living in a notorious "boarding house" in downtown Ionia that even Ionia PD did not want to enter and we weren't allowed to enter after Jay and myself encountered a smell that resembled meth.

Shortly after his release from Mercy Health Hackley, KC again refused to come to Right Door for prescribed psychotropic medication injections. It appears that Right Door requested police assistance in locating KC. Griffey asserted that for the next 10 days, his supervisors repeatedly asked him for status updates, but that the Ionia Police Department was not forthcoming. Law enforcement took KC into custody in mid-February 2021, and brought him to Sparrow Lansing's Emergency Department. He was aggressive and "sexually inappropriate with nursing staff, which unfortunately is quite common for him." The staff sedated and restrained KC.

Griffey believed at that point that KC required involuntary commitment at KPH. He claimed that "[t]hey," generally referring to Sparrow Lansing, "even recommended KPH due to [KC's] behavior at this hospitalization and previous stays." However, Pine Rest accepted KC as a resident patient upon his Sparrow Lansing release.

Pine Rest was the only hospital even willing to take a referral packet for [KC]. All other hospitals refused to even review the case, and Sparrow Lansing was genuinely surprised that Pine Rest took him. His continued stay reviews and my conversations with staff there told a narrative of a patient who was clearly experiencing psychosis and did not understand his need for treatment.

Griffey described that before KC's transfer to Pine Rest:

All conversations regarding placement at KPH did not get anywhere with my supervisor Kris Hamilton. I was continually told that KPH was not an option and that I simply did not understand the financial ramifications. Once or twice, I was told that it was only [Right Door CEO] Kerry Possehn's decision whether to place someone in KPH.

Griffey's concern about KC's placement amplified his existing stress:

I had already been emotionally distressed and burned out by KC before the hospitalization. There is ample documentation on my work email about this and many of my co-workers can vouch for this as well. This Pine Rest stay is when I approached complete burnout. I firmly believed that my agency was not appreciating the danger KC was to the community at large. I was being reassured by community providers and my co-workers that I was doing the right thing by

advocating for KPH, but supervisory staff continued to reiterate the guardian/AFC route and live with family. I will note that anyone that had face to face interaction with KC . . . fully supported KPH. [Right Door's in-house psychiatrist] also supported KPH but she understood the "politics" behind a KPH placement.

On March 8, 2021, Griffey called Hamilton "and informed her just how burned out [he] was by KC." Griffey told Hamilton "that it didn't feel like [he] was being heard on this case." According to Griffey, "The results from that meeting as it pertains to KC, was that [Possehn] planned to reach out to [Mid-State Health Network (MSHN)] directly and find another guardianship agency that might take KC's case."[2] Griffey reported "being overwhelmed by his caseload." Hamilton described that Griffey was "very emotional" during the call and "was yelling, swearing at one point." Griffey expressed general concerns with the mental health system and law enforcement. After discussing this conversation with Possehn, Hamilton removed KC from Griffey's caseload. During this call, Griffey also requested either a one-month leave of absence or to reduce his schedule to 32 hours per week. Right Door approved the reduced schedule but not the leave of absence.

In preparation for transferring the case to a new clinician, Griffey contacted the Ionia Probate Court regarding alternate guardianship agencies. The court indicated that it only contracted with Mid-Michigan Guardianship Services, which had already declined to service KC. After reviewing Griffey's records regarding KC, Hamilton advised Griffey that he "should not have documented that Sparrow Lansing recommended KPH placement and, if [Griffey] did, [he] should have documented that [he] redirected the conversation and/or told them that was [Right Door's] decision to make. [Hamilton] also mentioned that [Griffey's] clinical opinion should not be in the chart . . . ." According to Griffey, Hamilton accused him of "pushing a narrative." He quoted Hamilton as stating, "it is not your decision, it is not my decision, if he goes to KPH. That lies with [Possehn]." Griffey claimed that he was "shocked" and "immediately called [his] malpractice insurance" for guidance.

Hamilton recorded that she spoke to Griffey at 11:15 a.m. on March 9. In telling Griffey that KC was being removed from his caseload, Hamilton warned Griffey that "KC has [Griffey] far more involved emotionally on this case." Shortly after this conversation with Hamilton, Griffey received an email from Megan Raccuia, Right Door's on-staff psychiatrist. She notified Griffey that she had spoken to the psychiatrist treating KC at Pine Rest, Dr. Jonathan Dozeman. Dr. Dozeman had arranged for KC to receive both of his medication injections at the same time and increased their frequency from monthly to every three weeks. Under Pine Rest's care, KC signed consents for information to be released to his mother and sister. More specifically, Raccuia described:

> We talked about KPH as well as locked AFC home placement. Although actively psychotic, *Dr. Dozeman and the inpatient team hasn't been seeing any* aggressive behaviors or KC needing PRN agitation medications: in other words *behaviors that would qualify him for immediate admission to KPH from the hospital.* Although this doesn't mean it isn't an option moving forward, the

---

[2] MSHN is "the Medicaid Pre-Paid Inpatient Health Plan for The Right Door."

inpatient doctor didn't know if it would be able to happen from this admission even with his physical violence in the ED. I talked with them about the potential for locked AFC home and guardianship, although acknowledged time and hurdles of getting this in place will be difficult. [Emphasis added.][3]

Griffey contacted Possehn directly just before 5:00 p.m. on March 9. Possehn notified Hamilton of this call as KC was no longer on Griffey's caseload and because

> on several occasions, Griffey was counseled by his supervisor (who reported the matter to me) regarding his unacceptable practice of circumventing her authority and addressing his disagreement as to clinical and operational concerns without her knowledge to upper management staff of The Right Door, other supervisors, and outside agencies.

At 9:15 a.m. on March 10, Hamilton again spoke with Griffey. She admonished Griffey for circumventing the chain of command despite repeated orders not to do so. Hamilton noted:

> Next, I addressed with [Griffey] my record review of KC's chart and progress notes. I thanked him for ensuring these were all caught up for the [new clinician] . . . . I did express much concern specifically on documentation in the chart where he consulted with various professionals- one being an internal case manager, others being hospital professionals involved in KC['s] treatment. [Griffey] clearly is documenting and advocating his support of KC['s] admission to KPH. As he and I have discussed in the past, as well as he has heard from another program manager, there is a process for admission into a state psychiatric facility, and our agency follows this process of authorization that considers many layers and decisions, all of which is beyond the scope of a case manager. [Griffey] is not in a position to recommend such placement. I explained that his documentation should have read that – "our agency has a process for KPH and he will review with his supervisor." Instead, it is now written that he, as an employee of our agency, is recommending this without documentation of supervisory oversight, which places [Right Door] in a difficult position, liability and otherwise. I recognize that [Griffey] feels strongly about KC going to KPH, but I also emphasized, as I have in the past, [] he does not get to make that decision. [Griffey] said "understood."

In an affidavit, Hamilton provided further information about her March 10 conversation with Griffey:

> 18. . . . In reviewing [KC's] chart, I expressed concern to Griffey that he had intervened to promote his view that the consumer should be admitted to [KPH], contrary to the evaluations and recommendations of two board-certified psychiatrists. I explained to Mr. Griffey that there is a process for admission to a State psychiatric facility, and how The Right Door follows this process of

---

[3] This email contradicts Griffey's assertion that Dr. Raccuia "also supported KPH but she understood the 'politics' behind a KPH placement."

-5-

authorization that considers multiple factors and decisions, all of which is beyond the scope of a case manager's knowledge and authority. . . . Title II of the Americans with Disabilities Act, 42 USC § 12132 mandates that the mentally ill shall be in the least restrictive situation appropriate to their own health and safety and that of the community, and government agencies may properly rely on the "reasonable assessments of its own professionals" in determining appropriate placements. *Olmstead v L.C.*, 527 US 581; 119 S Ct 2176[;] 144 L Ed 2d 540 (1999)[.][4]

19. I was particularly concerned that Griffey had entered into [KC's] chart that Griffey, as an employee of The Right Door, recommended psychiatric

---

[4] MCL 330.1708 describes the treatment a mental health recipient is entitled to:

(1) A recipient shall receive mental health services suited to his or her condition.

(2) Mental health services shall be provided in a safe, sanitary, and humane treatment environment.

(3) Mental health services shall be offered *in the least restrictive setting that is appropriate and available*.

(4) A recipient has the right to be treated with dignity and respect. [Emphasis added.]

A "person requiring treatment" is defined by MCL 330.1401(1) as:

(a) An individual who has mental illness, and who as a result of that mental illness *can reasonably be expected within the near future to intentionally or unintentionally seriously physically injure himself, herself, or another individual, and who has engaged in an act or acts or made significant threats that are substantially supportive of the expectation*.

(b) An individual who has mental illness, and who as a result of that mental illness is unable to attend to those of his or her basic physical needs such as food, clothing, or shelter that must be attended to in order for the individual to avoid serious harm in the near future, and who has demonstrated that inability by failing to attend to those basic physical needs.

(c) An individual who has mental illness, whose judgment is so impaired by that mental illness, and whose lack of understanding of the need for treatment has caused him or her to demonstrate an unwillingness to voluntarily participate in or adhere to treatment that is necessary, on the basis of competent clinical opinion, to prevent a relapse or harmful deterioration of his or her condition, *and presents a substantial risk of significant physical or mental harm to the individual or others.* [Emphasis added.]

-6-

hospitalization of the consumer, which was grossly in excess of Griffey's authority or competence as a LMSW. I emphasized with Griffey, as I had in the past, that as a Case Manager, he must not usurp the authority of management. Griffey stated that he "understood."

At 10:39 a.m. on March 10, Griffey contacted the Mid-State Health Network (MSHN) customer service line. MSHN Customer Service and Recipient Rights Specialist Dan Dedloff reported that Griffey "voiced his concerns . . . that leadership of The Right Door was not making appropriate clinical decisions for a particular client on [his] caseload." Griffey expressed "his opinion [that] the client would benefit from being admitted to [KPH] upon his upcoming discharge from Pine Rest." This opinion was based on the client's "lack[] [of] insight into his need for treatment" and because "the client is a danger to others and could easily be responsible for a mass shooting in the community." Griffey described Right Door as "dismissive of his concerns." Griffey further "reported being fearful of retaliation for reporting his concerns directly to MSHN, but his fears over the individual's risk to the community outweighed his fear of retaliation." The only mention of this phone call in Griffey's statement is that after the March 8 conversation with Hamilton he "began to ponder, and eventually follow through with, the complaint to MSHN." Griffey "remember[ed] being told by" MSHN and his own malpractice insurer "that there is no reason [he] should be told that [his] clinical opinion should not be in the chart."

On March 11, Right Door learned that Griffey had contacted MSHN.[5] Over the next three weeks, MSHN investigated Right Door's handling of KC's case.

On March 15, Right Door conducted a weekly meeting to discuss the care of hospitalized clients. Despite that KC had been removed from Griffey's caseload by that time, Right Door's Medical Services Director, Teresa Martin, noted Griffey's absence at that meeting. But Martin also indicated that these meetings were held weekly, implying that KC's care would have been discussed during at least one prior meeting while KC remained Griffey's responsibility. Martin continued:

> 10. I had unscheduled meetings with . . . Griffey on two separate occasions during the time periods surrounding the hospitalizations of KC at Pine Rest. During these meetings, . . . Griffey informed me of his opinion that KC's next step in clinical treatment should include hospitalization at [KPH].
>
> 11. As a member of The Right Door's Leadership Team, with over 25 years of experience, during the second unscheduled meeting with . . . Griffey, I expressed professional disagreement with and did not support . . . Griffey's opinion as to further hospitalization of KC at [KPH] upon his discharge from Pine Rest.

---

[5] Hamilton's affidavit contradicts Griffey's repeated insistence that Right Door did not learn of his identity as the reporter until March 16.

12. . . . Griffey was the only professional employee at The Right Door who held the opinion that hospitalization of KC at [KPH] was the preferred course of treatment following his release from Pine Rest.

By March 16, Possehn had approved the use of general funds to pay an outside guardianship agency to service KC. KC was released from Pine Rest that day into the care of his mother pending an opening at a locked AFC facility. Dr. Dozeman noted improvement in KC's thought processes. The doctor found KC not "to be an imminent risk of harm to self or others," but opined that KC would "continue to require a high level of services due to the severity of his illness."

On March 16, Hamilton met via Zoom with agents of MSHN—Chief Behavioral Officer Todd Lewicki and Chief Compliance and Quality Officer Kim Zimmerman. Hamilton advised MSHN that Dr. Dozeman reported that KC was responding well to medication and did not meet the criteria for admission at KPH at that time. Zimmerman noted:

> The Right Door appeared to have a good plan in place to address the client[']s needs at discharge which may be yet this afternoon. [Hamilton] did say that she spoke with [Griffey] on the same day he contacted MSHN about going around her on this matter instead of addressing his concerns directly with her. She asked if I knew what time he contacted MSHN . . . . After the phone call I learned that [Griffey] contacted MSHN at 10:39 a.m.

On March 17 Right Door terminated Griffey's employment. Griffey claimed he asked Possehn the reason for his termination and was told, "You're employed at will and you can be terminated at any time." Possehn asserted in her affidavit:

> 17. As a consequence of Griffey's history of serious job performance deficiencies, his expression of dissatisfaction with his job, and his demands for decreased workload, decreased work hours, and a leave of absence in excess of his accrued vacation time and not medically certified, I determined that the best interests of The Right Door was to terminate Mr. Griffey's employment.
>
> 18. On March 17, 2021, I notified Mr. Griffey that his at-will employment with The Right Door was terminated effective immediately.

The termination letter merely indicated that Griffey's employment was "at will and has been terminated effective immediately."

Griffey filed suit shortly after his termination alleging a violation of the WPA. Griffey alleged that "[d]uring his employment, [he] performed his duties satisfactorily and without receiving any discipline as reflected by his performance reviews." (Griffey did not acknowledge the 2019 corrective action plan.) The basis for his claim was that Right Door terminated his employment for his report to MSHN of "suspected violations of law, rules and regulations regarding the treatment of a patient for which [Griffey] was responsible."

The Right Door denied that Griffey had satisfactorily performed his duties during his employment. It rejected Griffey's description of his communication with MSHN as a report of a

suspected violation of law. Rather, he called MSHN to express personal disagreement with the agency on a clinical issue. And Right Door asserted that its decision to terminate Griffey's employment was motivated by legitimate business reasons.

During discovery, Griffey provided a statement and Right Door presented affidavits from members of its staff and the MSHN agents involved in the investigation. No depositions were taken by either side. In answer to requests for admissions during discovery, Griffey repeatedly stated that Right Door's conduct rose to the level of malpractice.[6] He also stated that Possehn "has no clinical experience or background" and yet "was making unilateral treatment decisions for K.C. without consulting clinical staff or considering the opinions of community providers." It is important to note that Griffey did *not* accuse Possehn of illegally practicing medicine without a license. Rather, he stated that her conduct was malpractice.

Right Door subsequently filed a motion for summary disposition under MCR 2.116(C)(10). Right Door contended that Griffey had not established that he was engaged in a protected activity. Rather, Griffey repeatedly stated that he reported Right Door's "malpractice" to MSHN. As neither Possehn nor Hamilton are licensed health care professionals, they could not commit malpractice. Moreover, reports of alleged malpractice do not rise to the level of reporting a violation of law and therefore are not protected under the WPA as stated in *Landin v Healthsource Saginaw, Inc*, 305 Mich App 519; 854 NW2d 152 (2014). Right Door further asserted that Griffey knew his report was false. He reported that Right Door's determination that KC's placement in KPH was unsupported. This was contradicted by several licensed clinicians.

Even if Griffey could establish a prima facie case of retaliatory discrimination, Right Door contended that Griffey had not overcome evidence of the legitimate business reason for his termination. Griffey was an at-will employee with a long history of performance-related issues. Despite that he had not performed as expected, in March 2021, he expressed his desire to take a leave of absence or reduce his work hours. This would have shifted his responsibilities onto coworkers.

Griffey responded that no one had informed him that anyone had "performed or obtained [a] comprehensive clinical review of KC's case" or that he had been fully evaluated by a medical provider. He accused Right Door of "essentially exclud[ing]" him from the process. Accordingly, he believed his report—that Right Door's CEO unilaterally decided that KC did not require admission at KPH—was true at the time it was made. Griffey asserted that in his many conversations with Hamilton in the week leading up to his termination, she gave "no inkling that [his] job was in jeopardy." He described that until Right Door learned that he had contacted MSHN, his "employment had [been] relatively positive." The factors cited by Right Door in terminating his employment were "minor issues" that "occurred weeks if not months earlier." Right Door even approved his use of vacation time and a reduced schedule in the week before his termination, and filed a court order for client services indicating that it was contingent on Griffey's

---

[6] Griffey relied on *Landin v Healthsource Saginaw, Inc*, 305 Mich App 519; 854 NW2d 152 (2014), which is important because *Landin* holds that reporting malpractice is *not* a protected activity under the WPA unless the reported malpractice includes statutory violations.

schedule. Griffey contended that this supported that the cited grounds for his termination were pretextual.

Griffey contended that a person is not required to reference a specific law, regulation or rule when reporting a violation to engage in protected activity. It also does not matter if the report of illegal conduct is ultimately unsubstantiated. Griffey asserted that whether a person properly reported a suspected legal violation is judged on a "subjectively reasonable standard." Griffey continued that he had "reported a number of specific allegations that implicate legal issues." Specifically, Griffey suspected that "KC was a danger to himself and others and was receiving improper care," that "his concerns about KC weren't being taken seriously," and that Right Door was asking him "to falsify medical records." Griffey cited MCL 330.1946 as requiring Right Door to treat its patients in a manner that also protects the public and MCL 750.492a as prohibiting placing misleading or inaccurate information in a medical record.

In the event the court found summary disposition supportable, Griffey requested an opportunity to amend his complaint to add a public policy claim. Griffey cited *Landin* for the proposition that it violates public policy to terminate an employee for reporting malpractice or violations of the Public Health Code (PHC), MCL 333.1101 *et seq*.

Right Door retorted that Griffey "relie[d] chiefly on his unsworn and self-serving narrative . . . without any admissible evidence establishing a material fact question." Right Door further posited that Griffey mischaracterized and revised the basis for his report in an attempt to avoid dismissal. Griffey reported to MSHN only Right Door's "refusal to consider a [KPH] placement for K.C." He did not "report[] a number of specific allegations that implicate legal issues" as he claimed in response to the summary disposition motion. Further, Griffey presented no evidence to support his belief that KC posed a danger to himself or others, rendering his belief unreasonable. Griffey admitted "that he was ignorant of KC's treatment plan during the 14 days KC spent at Pine Rest." He did "not dispute that he absented himself from [Right Door's] team meetings during KC's 14-day stay at Pine Rest at which . . . critical factors about KC's hospitalization were discussed." Instead, he claimed, contrary to record evidence, that others shared his concerns about KC's treatment plan.

The circuit court granted summary disposition in Right Door's favor after a brief hearing. The court recited the following factual background:

> In December 2020, Griffey was assigned as the primary case worker for KC. On March 3, 2021, KC was hospitalized at [Pine Rest] under the direct care of Dr. Jonathan Dozeman, D.O., a board-certified psychiatrist. Griffey was never in contact with Dr. Dozeman, either direct or indirect. He also did not see Dr. Dozeman's notes and records, which were provided to his supervisor (Kris Hamilton) and discussed at hospitalization review meetings. Griffey chose not to attend those meetings.

> On March 8, 2021, Griffey advocated for a transfer of KC to [KPH], an involuntary commitment. However, according to Dr. Dozeman, KC would simply not meet the level of acuity of a state hospital, like KPH. Dr. Megan Raccuia, [Right Door's] own board-certified psychiatrist, concurred with Dr. Dozeman's

-10-

assessment. This was also an opinion shared by Griffey's supervisor. On March 9, 2021, KC was removed from Griffey's caseload.

On March 10, 2021, Griffey called MSHN, which provides a financial oversight function regarding [Right Door's] use of Medicaid funds. Griffey complained that the CEO of [Right Door], Kerry Possehn . . ., was making unilateral treatment decisions for KC without consulting the clinical staff or considering the opinions of community providers. This is the focus of the complaint. MSHN investigated, and it found no problems on [Right Door's] end.

On March 17, 2021, just shortly after MSHN completed its review, Griffey's employment was terminated. Possehn made this decision. According to records, Griffey failed to attend meetings without excuse, would not notify his supervisors that he would not be attending, did not document required training, failed to schedule meetings with subordinates, was repeatedly delinquent with caseload lists and other required documentation, had unacceptably low productivity, and failed to find a guardian for KC when shortly after the switch one was immediately found. Indeed, Griffey himself complained in February to March 2021 that he was feeling "burned out."

The circuit court ruled that Griffey had not engaged in a protected activity:

The purpose of Griffey's March 10, 2021 call to MSHN was to report Possehn had not consulted with clinical staff. That was not true. Possehn did in fact consult with clinical staff, and all of them said the same thing: KC did not meet the level of acuity for state hospitals, such as KPH. Griffey took one side (favoring KPH), everyone else took a different stand (in opposition to KPH). Possehn took the side with multiple doctors on it.

Griffey is free to speak his mind and tell MSHN anything about what his superiors do and do not do. The situation was moving though, and *KC was not even out of the hospital*. The Court does not see any relevant law that Possehn could have violated, or one that Griffey could have had a good-faith belief in.

The court also determined that there was no genuine issue of material fact that Griffey's termination was retaliatory.

Griffey's employment was "at will." The list above of Griffey's deficiencies . . . and the list in [Right Door's] brief creates a whole host of issues Griffey would need to get across in order to survive summary disposition. Griffey has failed to do that.

The circuit court did not address Griffey's request to amend his complaint.

Griffey now appeals.

## II. SUMMARY DISPOSITION

We review de novo a trial court's decision on a motion for summary disposition. *Richardson v Allstate Ins Co*, 328 Mich App 468, 471; 938 NW2d 749 (2019).

> A motion under MCR 2.116(C)(10) tests the factual support of a plaintiff's claim. Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. In reviewing a motion under MCR 2.116(C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. [*Zaher v Miotke*, 300 Mich App 132, 139-140; 832 NW2d 266 (2013) (quotation marks and citations omitted).]

An action for retaliatory discharge in violation of the WPA is governed by MCL 15.362 as follows:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee . . . reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false . . . .

The WPA was enacted to protect "employees who report a violation or suspected violation of state, local, or federal law. . . ." *Whitman v City of Burton*, 493 Mich 303, 312; 831 NW2d 223 (2013) (quotation marks and citation omitted). The act "furthers this objective by removing barriers that may interfere with employee efforts to report those violations or suspected violations, thus establishing a cause of action for an employee who has suffered an adverse employment action for reporting or being about to report a violation or suspected violation of the law." *Id*.

A plaintiff may establish a prima facie case of retaliatory discharge under the WPA "by showing that (1) the plaintiff was engaged in protected activity as defined by the act, (2) the defendant took an adverse employment action against the plaintiff, and (3) a causal connection exists between the protected activity and the adverse employment action." *Debano-Griffin v Lake Co*, 493 Mich 167, 175; 828 NW2d 634 (2013) (quotation marks and citation omitted). This showing can be made by direct or circumstantial evidence. Where, as here, the plaintiff must rely on circumstantial evidence from which the factfinder could infer that he or she suffered unlawful retaliation, a burden-shifting analysis applies. *Id*. at 176. The burden shifts to the defendant to articulate a legitimate business reason for the adverse employment action. *Id*. If the defendant does so, the burden returns to the plaintiff to establish that the proffered legitimate reason was merely a pretext for the adverse employment action. *Id*.

-12-

" 'Protected activity' under the WPA consists of (1) reporting to a public body a violation" or "suspected violation" "of a law, regulation, or rule; (2) being about to report such a violation to a public body; or (3) being asked by a public body to participate in an investigation." *Debano-Griffin v Lake Co*, 486 Mich 938, 938; 782 NW2d 502 (2010); *Chandler v Dowell Schlumberger Inc*, 456 Mich 395, 399; 572 NW2d 210 (1998). It is undisputed that MSHN is "a public body" for purposes of the WPA. At issue is whether Griffey's report was of a violation or suspected violation "of a law, regulation, or rule."

Reporting malpractice or suspected malpractice is not necessarily protected activity under the WPA because malpractice need not involve a violation of a law, regulation, or rule; rather, malpractice involves a breach of a standard of care. As stated in *Landin*, 305 Mich App at 532-533:

> However, [the] plaintiff did not originate a report or complaint alleging a violation of the [PHC], he accused a coworker of malpractice. To establish a cause of action for medical malpractice "a plaintiff must establish four elements: (1) the appropriate standard of care governing the defendant's conduct at the time of the purported negligence, (2) that the defendant breached that standard of care, (3) that the plaintiff was injured, and (4) that the plaintiff's injuries were the proximate result of the defendant's breach of the applicable standard of care." *Craig ex rel Craig v Oakwood Hosp*, 471 Mich 67, 86; 684 NW2d 296 (2004). There is no requirement that in order to establish a claim of malpractice, one must necessarily allege a violation of the [PHC].

Neither party presented an audio recording of Griffey's March 10 call to MSHN. Griffey only briefly touched upon this call in his statement. He asserted, "This is also when I began to ponder, and eventually follow through with, the complaint to MSHN. I remember being told by [MSHN] that there is no reason I should be told that my clinical opinion should not be in the chart." MSHN noted Griffey's call in its compliance log produced during discovery. The log indicates that Dedloff took a call from Griffey on the customer service line. Griffey "voic[ed] concerns that leadership at the Right Door is not making appropriate clinical decisions for a client on his caseload." Dedloff notified Zimmerman and Lewicki by email that Griffey

> feels that the individual is a danger to others and could easily be responsible for a mass shooting in the community. He has communicated his concerns to The Right Door leadership and has recommended the individual be considered for [KPH] due to the risk. He reported that leadership has been dismissive of his concerns. He was told that leadership has spoken to MSHN and considered all the options but KPH is not being considered.

MSHN's final report similarly indicates that Griffey contacted MSHN on March 10 "to report concerns that the leadership at The Right Door . . . were not making appropriate clinical decisions for a client that [Griffey] provided case management services for." The record indicates that Lewicki contacted Griffey on March 12 for further information. However, there is no record of what was said during that call.

The record establishes that beyond general malpractice concerns, Griffey implied that he reported that Right Door had directed him not to place his clinical opinion in KC's chart. Griffey contends that Right Door's direction to omit his clinical opinion from KC's chart violated MCL 750.492a(1), which provides:

> Except as otherwise provided in subsection (3), a health care provider or other person, knowing that the information is misleading or inaccurate, shall not intentionally, willfully, or recklessly place or direct another to place in a patient's medical records or chart misleading or inaccurate information regarding the diagnosis, treatment, or cause of a patient's condition. . . .

However, there is no evidence that Griffey reported this as a violation of law to MSHN. The record evidence paints a picture of Griffey generally complaining to MSHN that his clinical opinion was being discounted or ignored.

Griffey also implied that MSHN had violated MCL 330.1946(1), which provides:

> If a patient communicates to a mental health professional who is treating the patient a threat of physical violence against a reasonably identifiable third person and the recipient has the apparent intent and ability to carry out that threat in the foreseeable future, the mental health professional has a duty to take action as prescribed in subsection (2).

MCL 330.1946(2) requires the mental health professional to hospitalize the patient or report the threat to certain entities. However, there is no evidence that KC threatened any one or even made a generalized threat. Rather, the record establishes that KC acted out violently upon his hospitalization. The record also shows that KC suffers from delusions and hallucinations. But Griffey has never explained why he believed KC was so dangerous that he might commit a mass shooting. Indeed, KC's medical records indicate that he did not even have access to firearms.

Ultimately, Griffey's was not the type of report falling within the ambit of protected activity. Absent protected activity, the circuit court correctly dismissed Griffey's WPA retaliatory discharge claim. And absent any protected activity, the court was not required to consider whether Right Door cited legitimate business reasons to support Griffey's termination.

### III. AMENDMENT OF COMPLAINT

Griffey asked for the opportunity to amend his complaint to allege that his termination went against public policy. MCR 2.116(I)(5) provides that if a court grants a motion for summary disposition under MCR 2.116(C)(10), "the court shall give the parties an opportunity to amend their pleadings as provided by MCR 2.118, unless the evidence then before the court shows that amendment would not be justified." The Michigan Supreme Court has explained that an opportunity to amend must be permitted unless "the amendment would be futile." *Weymers v Khera*, 454 Mich 639, 658; 563 NW2d 647 (1997). "An amendment is futile if it merely restates the allegations already made or adds allegations that still fail to state a claim." *Mich Head & Spine Inst, PC v Mich Assigned Claims Plan*, 331 Mich App 262, 277; 951 NW2d 731 (2019) (quotation marks and citation omitted). As stated in *Dowerk v Oxford Charter Twp*, 233 Mich App 62, 76; 592 NW2d 724 (1998), "An amendment is futile where the paragraphs or counts the plaintiff seeks

to add merely restate, or slightly elaborate on, allegations already pleaded." Otherwise, the court rules provide that leave to amend "shall be freely given when justice so requires." MCR 2.118(A)(2).

The circuit court ignored Griffey's request, implicitly denying it. And the record supports that the court should have granted his motion to add a public policy count.

> Michigan law generally presumes that employment relationships are terminable at the will of either party. *Lytle v Malady (On Rehearing)*, 458 Mich 153, 163; 579 NW2d 906 (1998). There is, however, an exception to the at-will employment doctrine "based on the principle that some grounds for discharging an employee are so contrary to public policy as to be actionable." *Suchodolski v Michigan Consol Gas Co*, 412 Mich 692, 695; 316 NW2d 710 (1982). [*Landin*, 305 Mich App at 523.]

"[P]ublic policy is violated when (a) a statute specifically prohibits the discharge, (b) the employee is discharged for refusing to violate the law, or (c) the employee is discharged for exercising a well-established statutory right." *Lewandowski v Nuclear Mgmt Co, LLC*, 272 Mich App 120, 127; 724 NW2d 718 (2006), citing *Suchodolski*, 412 Mich at 695-696.

When a plaintiff has a claim under the WPA, any common-law public-policy action arising from the same conduct is preempted. *Stegall v Resource Tech Corp (On Remand)*, ___ Mich App ___; ___ NW2d ___ (2023) (Docket No. 341197), slip op at 6-7; *Landin*, 305 Mich App at 532. To raise a public policy claim, that action must be "factually distinct" from any viable WPA claim. *Janetsky v Saginaw Co*, ___ Mich ___; 982 NW2d 374, 376 (2022). "If plaintiff was simply reporting a violation of an article or rule under the [PHC]," his public policy claim would be preempted "given that the remedies provided by the WPA are exclusive and not cumulative." *Landin*, 305 Mich App at 532.[7] But as noted above, Griffey's allegations do not fall within the WPA. See also *Janetsky*, 982 NW2d at 376 ("[T]he WPA governs only *reports* of violations or suspected violations of the law, and plaintiff's public-policy claim is not premised on such conduct.").

Griffey asserted that his termination was against public policy as provided in MCL 333.20176a(1) of the PHC, which provides, in relevant part:

---

[7] As noted by the Supreme Court in *Rivera v SVRC Indus, Inc*, 507 Mich 962, 963-964; 959 NW2d 704 (2021):

> Because plaintiff has not demonstrated a question of fact that this conduct entitles her to recover under the WPA, her public-policy claim based on this conduct is not preempted by the WPA. See *Pace v Edel-Harrelson*, 499 Mich 1, 10 n 19; 878 NW2d 784 (2016), quoting *Anzaldua v Neogen Corp*, 292 Mich App 626, 631; 808 NW2d 804 (2011) (" '[I]f the WPA does not apply, it provides no remedy and there is no preemption.' ").

A health facility or agency shall not discharge or discipline, threaten to discharge or discipline, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee or an individual acting on behalf of the employee does either or both of the following:

(a) In good faith reports or intends to report, verbally or in writing, the malpractice of a health professional or a violation of this article, article 7, article 8, or article 15 or a rule promulgated under this article, article 7, article 8, or article 15.

This Court found that a plaintiff may assert that he or she was terminated in violation of public policy based on this statute in *Landin*. Such an action is an exception to the general prohibition of wrongful termination lawsuits involving at-will employees, this Court held, because a statute specifically prohibits the termination and because the employee is terminated for exercising a statutory right. *Landin*, 305 Mich App at 529-531.

Much like a claim raised under the WPA, a plaintiff claiming retaliatory discharge in violation of public policy "must show (1) that he engaged in a protected activity, (2) that this was known by defendant, (3) that defendant took an employment action adverse to plaintiff, and (4) that there was a causal connection between the protected activity and the adverse employment action." *Id*. at 533. Griffey's proposed amendment alleged his engagement in a protected activity—making a report of malpractice or a violation of the PHC as contemplated by MCL 333.20176a(1). Right Door was aware Griffey made this report. Right Door terminated Griffey's employment shortly after his report.

Right Door contends that amendment of the complaint would be futile because Griffey could not report suspected malpractice. Griffey complained of Possehn's conduct, but Possehn was not a licensed medical provider and therefore could not commit malpractice. We find this challenge unavailing. Although Griffey has expressed his belief that Possehn was making decisions without the input of licensed clinicians, his report to MSHN was that Right Door was inadequately handling the case of a severely mentally ill client. His report was not limited to Possehn's conduct.

Right Door further contends that the amendment would be futile because Griffey cannot overcome the evidence of the legitimate business reasons for Griffey's termination. Therefore, he cannot establish the necessary causal connection. Right Door listed performance deficiencies dating back to 2019 and continuing up to the time of Griffey's termination. Griffey emphasized that in the week leading up to his termination, Right Door agreed to accommodations in his work schedule and continued to file court documents listing him as a case manager. He described the cited deficiencies in his work as "minor" and alleged that his failures in handling KC's case were caused, in part, by Right Door. Griffey also emphasized the timing of his termination after his report, although he inaccurately states that Right Door did not learn that he made the MSHN report until one day before his termination. When considering a motion for summary disposition, "[t]he trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes." *Pioneer State Mut Ins Co v Dells*, 301 Mich App 368, 377; 836 NW2d 257 (2013). Accordingly, the conflict in the evidence creates a factual issue and does not render the amendment futile.

We affirm the summary dismissal of the WPA claim, reverse the implicit denial of the motion to amend, and remand for continued proceedings.  We do not retain jurisdiction.

/s/ Elizabeth L. Gleicher
/s/ Michelle M. Rick
/s/ Allie Greenleaf Maldonado